**STATE**

*v.*

**Amphone PHOMMACHAK.**

**No. 94–270–C.A.**

Supreme Court of Rhode Island.

April 16, 1996.

Annie Goldberg, Asst. Atty. General, Aaron Weisman, Asst. Atty. General, for Plaintiff.

Paula Rosin, Asst. Public Defender, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on appeal by the defendant, Amphone Phommachak, following a conviction after a jury trial in the Providence County Superior Court on charges of burglary, conspiracy to commit burglary, first-degree robbery, two counts of kidnap-

ping, and carrying a pistol without a license. The defendant was sentenced to concurrent sentences of fifty years' imprisonment each for the burglary, the first-degree robbery, and the two kidnapping counts, and ten years for the conspiracy count. A ten-year suspended sentence on the weapons charge was imposed to run consecutively to the others. On appeal the defendant contends that the trial justice committed prejudicial reversible error when he questioned the defendant in a manner that the defendant believes led the jury to believe that he had committed perjury. We disagree and affirm the conviction. The facts and the chronology of events insofar as pertinent to this appeal are as follows.

At approximately 8 p.m. on the evening of March 26, 1992, Thongtane and Oudom X closed and locked up their family food market located on Smith Street in the city of Providence. Along with other members of their extended family who had worked that day at the market, the Xs drove to their home at 136 Babcock Street in Providence. Thongtane X stopped the family van at the beginning of the driveway and let his wife, Oudom; his mother-in-law, Somchit; his sister-in-law, Ouday; his fifteen-year-old son, Anoukane; and his thirty-one-year-old nephew, Sisouvanh Chanthalakeo, disembark from the van before parking it farther up the narrow driveway. As it was a rainy night, everyone ran into the house, except for Thongtane and his nine-year-old daughter, Sousadachanh, who stayed with her father in the van. Anoukane was carrying a window frame as he walked into the house after leaving the van, and Sisouvanh was carrying a basket of food to the basement.

There were three other members of the extended X family who had not worked at the market that day and were already in the house: Thongtane's younger son, Oulane, who was in the attic listening to music, his fourteen-year-old-niece, Sirina Souvorivong, who was doing homework in her room, and Thongtane's twenty-three-year-old brother-in-law, Nakhonekham Aphaivong, who was asleep in an upstairs bedroom.

As Thongtane X and Sousadachanh alighted from the parked van, two masked men came up behind Thongtane, placed a gun to

his head and spoke to him in Laotian, ordering him to drop his briefcase and go into the house. At this point Sousadachanh bolted ahead to the house and burst into the room where her cousin Sirina was doing homework. She exclaimed to Sirina that "two guys [are] robbing our house." Sirina, who at first was in a state of disbelief upon hearing this news, went into the living room where she saw a man holding her uncle at gunpoint and a second man with her cousin Anoukane. Her testimony revealed that both of these intruders were wearing bandanas over their faces.

At the same time Nakhonekham Aphaivong was awakened by Thongtane's younger son, Oulane, who ran into his room, exclaiming, "[A] guy came out with a gun." Nakhonekham, who was apparently accustomed to Oulane's "always making joke[s] on me," told his nephew "not to make a joke on me, I'm trying to be sleeping." Nevertheless, as he got up and took two steps beyond his bedroom door, he "saw two guy[s] with a gun and knife" who forced him to lie down. Meanwhile, Thongtane's nephew, Sisouvanh Chanthalakeo, had put the food basket down in the basement and was walking into the stereo room when he heard his grandmother scream. She was running toward him pursued by a masked man carrying a gun. The masked man ordered Sisouvanh to get down on the floor whereupon he hit him on the head, bound his hands with duct tape, and placed barbells across his legs. Sisouvanh was lying face down on the floor when he heard the robber tell his grandmother to remove her gold belt and chain. The robber also demanded Sisouvanh's gold chain. At this point in the sequence of events the robber left the room, leaving Sisouvanh and his grandmother on the floor.

Meanwhile, Oudom X, who was in her bedroom, heard her mother's screams and ran out of the bedroom to investigate. She did not see her mother but saw her husband, Thongtane, being held at gunpoint. Oudom X then ran back into her bedroom and locked the door. From her bedroom hiding place, Oudom could hear "the ripping" of duct tape as other members of her family were being bound and voices that were "demand[ing]

people to lie on the floor," exclaiming, "[g]ive me the money, where's the money."

In the commotion Sousadachanh was able to get out of the house. She ran to the home of a friend on the street, whose brother telephoned the police. Providence Police Officer Thomas Rawnsley (Rawnsley) was the first officer on the scene. He testified that he responded to a call "at approximately eight o'clock that evening" that reported "five men with guns" at 136 Babcock Street. Approaching the rear of the house, he found the back door open, drew his service revolver, and entered a small hallway through the open door. Initially he saw and heard nothing as he looked down the cellar stairway, looked up into what appeared to be a living area, and then looked back down once again into the cellar. However, when he turned for a second time to look up again to the steps leading to the living area, he saw "what appeared to be two Asian males, one dressed in dark colored clothing," wearing "a black hat" and "some kind of kerchief covering a good part of his face" and holding "what appeared to be a nine millimeter handgun, * * * dark in color; and he [was holding] somebody in a light colored T-shirt" who later proved to be Thongtane X. Officer Rawnsley further testified:

"At that point he appeared to be startled. He looked at me, I looked at him. I started to raise my revolver, and before I could, he lunged his hand forward with a pointing motion. I knew there was no way I could outdraw him even though I had my hand on my gun. I leaned back toward the cellar stairs, and I heard a shot ring out."

After hearing the shot, Rawnsley immediately leaned back, then leaned up and pointed his weapon up the stairwell. There was no one in sight, and he began to go up the stairs after the two Asian males but then "thought the better of it and retreated back into the hallway area." At this point Patrolman John McKenna (McKenna), who moments earlier had been cruising in a marked patrol car when he heard the call reporting five subjects with guns a mile or a mile-and-a-half away, arrived at the Babcock Street address and went to stand in the hallway

next to Rawnsley. As he entered with his gun drawn, he heard Rawnsley exclaim, "[W]atch out, one of them has a gun!" Both officers then left the house and immediately radioed for assistance. Moments later "[t]he same two subjects" Rawnsley had seen appeared in the back doorway, one in black clothing holding a gun "to what appeared to be a hostage's head." The gunman wanted to know who had called the police, told Rawnsley and McKenna to leave, and threatened "to start dismembering people, sending fingers out the door" if the officers did not do as they were told, whereupon the gunman pulled the hostage back into the doorway and closed the screen door. Then second and third shots rang out, and immediately thereafter additional officers began arriving at the scene.

While the foregoing events were occurring outside, the other robbers had been busy inside the house, tying up members of the X family and ransacking the various rooms, looking for money and valuables to steal. The robbers began to panic when it became known that police were outside and "were * * * running around the house," and they asked Thongtane X "which way to get out of the house." The next startling event to occur during this home invasion was the firing of a gunshot from inside the house through the living-room window.

Three different calls were made to police headquarters in quick succession concerning the home invasion on Babcock Street: first, the call from neighbors after Sousadachanh had escaped and run to their house, reporting "men with guns;" second, an officer's report verifying that there were "men with guns" at that address; and third, arriving several minutes after the second call, an officer's report that "shots had been fired." At this point Lieutenant John Reis (Reis), a fifteen-year veteran of the Providence police department with FBI training in hostage negotiations, responded to the call to the scene. Meanwhile, McKenna and another police officer had been able to obtain the release of one of the younger members of the X family, Thongtane's niece, Sirina, on the promise that they would remove the officers' patrol car from the front of the house.

A command post was set up in the house next door while the surrounding houses were evacuated. S.W.A.T. personnel were activated, rescue squads were ordered to the scene and police monitoring units were ordered to turn on their floodlights and train them on the house. Once these preliminary tactical precautions had been established, Reis took up a position approximately ten feet from the back door and began "yelling for anyone to come out." Shortly thereafter, a man with a white bandana wrapped around the lower portion of his face appeared in the doorway, holding "what appeared to be a dark colored nine millimeter automatic pistol * * * placed to the temple of the young boy in front of him." This assailant spoke to Reis in English and told him that "he wanted all the police to get away." Upon informing him that he could not meet such a demand, Reis asked him his name and "he directed [Reis] to call him X."

Reis's negotiations with "X" to obtain the safe release of the remaining hostages and the surrender of their captors continued throughout the night, in pouring rain and extreme cold, with "upwards of 50 or 60" officers on the scene as well as the Attorney General, the mayor, and the chief of police. The kidnappers' basic demand was "that the police leave" the scene and allow "X" and his "boys" time "to get out of there."

As negotiations continued, "X" demanded helicopter transportation as a means of escape but was informed by Reis that such a demand could not be arranged. "X" responded "that he was going to give [Reis] an hour and if [the police] didn't move out of the area and [the kidnappers] weren't supplied with a means of escape, that he would start throwing a body out per hour, starting in an hour." It was then nine-thirty in the evening. The hour passed without incident to Reis's relief. Nevertheless the situation remained tense because Reis knew the kidnappers were armed, had no idea exactly how many suspects or even how many hostages were in the house, and had every reason to believe the kidnappers' threats as he continued his efforts to negotiate the safe release of the hostages.

For the next hour Reis attempted to establish a communications link between the command post and the inside of the house at 136 Babcock Street by offering to send a cellular phone over or perhaps even to communicate via walkie-talkie. Neither phone nor radio contact was ever established as the parties reached an impasse regarding how the equipment would be delivered.

As the night wore on and it became clear the two sides were not making much progress in negotiating the release of the hostages, Reis proposed to "X" that they "fill out a contract" that would be ratified by the Attorney General, who was present at the command post, promising "that no charges would be brought against any of [the captors]." At this point, fearing for the safety of the hostages and interested in getting them out of the house, Reis felt compelled to propose such a solution. However, even though the proposal was apparently acceptable, another impasse was reached and the contract negotiations broke down. At one point "X" offered to "exchange hostages for the chief of police." For obvious reasons, this offer was not acceptable to Reis. However, shortly after the midnight hour, an agreement was reached for the exchange of one more hostage, twelve-year-old Oulane, for Reis's order removing all police officers and patrol cars from the front of the house.

Finally, at approximately 5 a.m., a uniformed officer informed Reis that "[the captors] were calling [him] from inside the house." Reis left the command post and went to the back door of 136 Babcock Street. Standing at the back door with their hands bound with tape were Thongtane and Oudom X. Oudom X told Reis that the captors were going to surrender. Reis asked Oudom X where the suspects were and was informed that they were "inside sleeping." Reis was initially wary and thought perhaps this "was a ruse" and the robbers "were going to push the hostages out in front of [the police] and come out shooting" or that perhaps the robbers would "[make] believe they were hostages." In fact, the information that the robbers were sleeping inside was true, and "everyone started coming out of the house with their hands raised above their heads."

At that point all individuals emerging from the house were treated as suspects because the police were unable to distinguish between the hostages and the robbers. Accordingly all but Oudom and her mother, Somchit, were handcuffed and "taken off to the command post."

Four of the five suspects were identified by family members immediately inside the command post. The fifth suspect, who had spent the evening in a room with Thongtane's nephew, Sisouvanh Chanthalakeo, posing as a family member, was exposed at police headquarters by Nakhonekham Aphaivong, Oudom X's brother.

The defendant in the instant case, Amphone Phommachak, was identified by Thongtane X, Oudom X, their son Anoukane, and Oudom's brother, as an active participant in the home invasion and the standoff. Anoukane identified defendant as the man who had initially surprised him while he was carrying the window frame into the house by brandishing a knife at the outset of the robbery. Nakhonekam testified that defendant had held a knife and sometimes a gun at various times during the night. Oudom testified that defendant appeared to be the leader, often giving orders to the others and gathering all the others for group discussions, and that defendant was the one who told the family that "everybody is going to die in that house" if they did not let one of the men escape posing as one of the family.

At trial, defendant testified in his own behalf and professed to be an unwitting bystander. He claimed he had never met three of his four codefendants before that night, had never been to Providence, and spoke so little English that he understood almost nothing of what was said in the car until "they went to the house where the accident happened and parked near there." He testified that when three of his codefendants left the car, he and another codefendant remained behind but shortly thereafter joined the others for what he thought would be "some meeting or party." He claimed that he did not "tie anybody [up]," that he only held the knife to cut the duct tape for two people that another codefendant had tied up and "to cut fruit into pieces," and that he

only held a gun when he was ordered to by another codefendant. He also testified that he took no money from anyone that night, that he did not know a robbery was planned, and that he merely followed orders because he was afraid that he himself would be shot by one of his codefendants if he did not obey him.

The jury found defendant guilty of burglary, conspiracy to commit burglary, first-degree robbery of Oudom X, kidnapping of Thongtane X, kidnapping of Oudom X, and carrying a pistol without a license. The defendant's motion for a new trial was denied. In his decision the trial justice found that defendant "simply lied to us, lied to the jury, lied to the Court." The defendant was sentenced on May 7, 1993. This appeal followed.

The defendant's sole issue on appeal concerns the propriety of seven questions posed by the trial justice to defendant at the conclusion of the prosecutor's cross-examination. The questions related to oral statements defendant had made to the police after he had been taken into custody. The seven questions the trial justice posed to defendant were as follows:

"THE COURT: Mr. Phommachak, before the car that you were in, the red Honda, drove out to Babcock Street, did you, while in that car along with the others, ever drive by the T O Oriental Market on Smith Street?

"A: Before get to Babcock, I know there was an oriental market but I don't know if it was the T O Orient[ ]al Market or not.

"THE COURT: Was it on Smith Street or Smith Hill in Providence?

"A: I don't remember the street.

"THE COURT: You don't remember the street. Did you know the name of Chansamone's friend that he met?

"A: At first got there, I heard him call him Tit, something like that.

"THE COURT: Did you ever tell anyone his name was Sy?

"A: No.

"THE COURT: Did you ever tell anyone where Sy lived?

"A: I never said Sy. I don't know who named Sy. I only know someone named Tit.

"THE COURT: Ask him if he knows where Zone Street is?

"A: No.

"THE COURT: Did he ever go to Zone Street?

"A: I don't know which one is Zone Street."

To place these questions in context, the trial justice asked defendant whether the car in which he rode drove past the market owned by the victims, whether he knew the location of the market or the name of an accomplice, and whether he knew the location of, or had ever been to, Zone Street. The trial justice noted that the seven questions were intended only to clarify whether defendant had ever been in the area, in light of his police statement in which he described a house on Zone Street, which is in the Smith Hill section of Providence not far from the victims' store, as being on "a one way street near a 7–Eleven" and "in a part of the city that was near a big large white building." The defendant's counsel made no objection to any of the questions as each was asked. However, at the conclusion of the inquiry, defense counsel asked to be heard at sidebar where he then objected because he anticipated these matters would ultimately be brought out through a rebuttal witness for the state. Defense counsel did not request a remedy during the sidebar conference. The defense then rested, and court was recessed pending commencement of the state's rebuttal case.

When the trial resumed and without the jury's presence, defense counsel told the court he "would merely like to add to" what he had stated at sidebar, and at that point, defense counsel moved "to pass the case" on the basis of the trial justice's seven questions. Defense counsel explained that "although they certainly may be relevant for the Court to determine certain things as a fact finder in search for the truth, the actual questions themselves, I anticipate, are to come from or—the actual facts of those questions I anticipate to come from a police officer" in the state's rebuttal. It was defense

counsel's position that although the court has an absolute right to ask questions, the nature of the questions posed by the trial justice, although proper if asked by the prosecution, created incurable prejudice that the defense could not overcome short of a mistrial. In the alternative, defense counsel requested a cautionary instruction.

 The trial justice declined to grant a mistrial; however, in the final charge he admonished the jury at length that it must draw no inference from "anything said by the Court during the course of the trial." The trial justice specifically told the jury:

"Like the attorneys, the Court is, under no circumstances, permitted to give you any evidence. So, if you—if any of you feel that during the course of this trial you could have gotten any clues or hints of the evidence from the Judge, you've made a horrible mistake because you've gotten no hints or clues. I'm not permitted, under any circumstances, to pass on evidence to a jury. If I could, I couldn't be the Judge. I'd be a witness. So, do not, under any circumstances, consider anything said by the Court during the course of this trial as evidence.

"Now, why do I say that to you? Many times during the course of the trial when there's an objection made, I might say to the attorneys, it's my understanding that the witness said this or the witness said that. Now, you may have a different recollection of what the witness said, and yet you may put aside your own recollection and say well, if the Judge said it, that must be so. That's not so. Keep in mind that you are the sole judges of the facts. Anything said by me is not evidence and cannot, under any circumstances, be considered as evidence by you. Many times, you know, jurors will do that. They may be undecided on something and they'll say, well, I remember what the Judge said, and that's wrong. You cannot, under any circumstances, do that.

"Now, I should also tell you that in addition to not placing any weight or emphasis or anything of that nature upon anything that I've said during the course of the trial with regard to what I viewed

the evidence to be, I also instruct you that under no circumstances should you place any significance or any greater importance or weight upon any questions that I may have asked during the course of the trial. In other words, simply because I asked a question, don't place any greater weight on that than anything else you've heard. I ask questions sometimes to clarify my particular trial notes. That has nothing to do with you. Keep in mind what I've said earlier, that I cannot and I do not have any right to intrude upon your fact-finding obligation and your fact-finding responsibility."

Notwithstanding these explicit instructions, defendant on appeal asserts that it was reversible error for the trial justice to have denied defendant's motion for a mistrial, claiming a denial of the due-process guarantees of both the Rhode Island and the United States Constitutions. We disagree.

 Even though the greater portion of defendant's argument is given to an examination of the trial justice's motives in posing the seven questions, we are of the opinion that regardless of the trial justice's motivation, the question is what effect, if any, such a query had upon the jurors. We conclude that the seven questions asked by the trial justice were innocuous and gave no indication that he disbelieved defendant, nor did they present any suggestion to the jury that the judge had become an advocate. The authority of the trial justice to interrogate a witness extends to any "relevant matters proper to be presented to the jury" in furtherance of justice. *State v. Amaral,* 47 R.I. 245, 249–50, 132 A. 547, 549 (1926). However, the trial justice must proceed "with caution" in such an examination. *Id.* at 250, 132 A. at 549. He or she must also "guard against even the appearance of changing his [or her] position from that of a judicial officer impartially presiding at the trial to that of a partisan advocate interested in establishing the position of either party." 47 R.I. at 250, 132 A. at 550. The trial justice "should not be led to express by language, or the tones of his [or her] voice, or in any other manner his [or her] opinion as to the credibility of the witness or the weight which should be given to

his testimony. His [or her] examination is to be governed by the same rules as those which govern counsel and his [or her] questions are equally open to exception." *Id.*

■ The quoted language from *Amaral* above presents a threshold problem with defendant's claim presented for review. In *Amaral,* this court declared that "[t]o the questions of a judge the same rules apply as to the time and method of making objections and taking exceptions as govern the objections and exceptions of counsel to the questions of his adversary." 47 R.I. at 250–51, 132 A. at 550. "Objections and exceptions to questions must be taken as soon as the question is asked and before it is answered, and if the answer to a question is not responsive or is in any way improper motion should be made that it be stricken out." *Id.* at 251, 132 A. 547, 132 A. at 550.

■ Review of the record in the instant case indicates that no objection whatsoever was ever posed by defense counsel to any of the seven questions asked and answered until the court had concluded its inquiry and invited other examination. At this point defense counsel asked to be heard at sidebar and stated his general objection "to the Court's questions because it appears that information is obviously going to come in front of this jury if the State offers some rebuttal testimony, and I'm sure they're going to offer some rebuttal testimony." Defense counsel's explanation was that he feared that the seven questions posed to defendant from the trial justice "would give an indication of the lack of credibility of this particular witness rather than the prosecution." He then declared, "For this reason, I object to the Court's question."

We hold that this objection was made too late and too generally to preserve the issue for review. This court stated in *Amaral:*

"We will not permit a general exception taken after an examination, such as the ones in question, which will enable a party to press before us any claim of error which upon later careful consideration of the record the party may desire to urge with reference to any portion of an extended examination of a witness by a justice of the

Superior Court." 47 R.I. at 251, 132 A. at 550. *Accord State v. McVeigh,* 660 A.2d 269, 274 (R.I.1995).

Nevertheless, even if this issue had been preserved for review, we would be constrained to conclude that the trial justice committed no error in asking the questions. Moreover, there could be no basis whatever to argue that these simple and straightforward questions could have provided any conceivable basis for granting a motion for mistrial.

The record in the instant case is devoid of anything that "demonstrates that the questions as submitted by the trial justice [either] prejudiced defendant's case [or] created the appearance that the justice was favoring the prosecution," *State v. Fournier,* 448 A.2d 1230, 1232 (R.I.1982), nor can anything in the record lead one "to believe that the tenor of the trial justice's questioning contained prejudicial influences" and "therefore impinged on the province of the jury as a fact-finding body in assessing the defendant's culpability." *State v. Evans,* 618 A.2d 1283, 1284 (R.I.1993). On this record the claim is utterly without merit that the seven questions posed to defendant following his testimony deprived him of his constitutional right to a fair trial.

Rule 614(B) of the Rhode Island Rules of Evidence expressly provides that the "court may interrogate witnesses, whether called by itself or by a party." This court has repeatedly held that "[t]he asking of questions of a witness by a justice is proper in the furtherance of justice." *Fournier,* 448 A.2d at 1232 (citing *State v. Dionne,* 442 A.2d 876, 885 (R.I.1982)). It is clear beyond doubt in the instant case that at no time did the trial justice assume the role of an advocate, nor did his conduct indicate that he disbelieved defendant. Moreover, the trial justice was careful in his charge to forestall any possible inappropriate inferences by his admonition to the jury not to place any weight or emphasis upon any questions that he had asked or anything that he had said during the course of the trial. We are of the opinion that the trial justice maintained the requisite impartiality during the course of the trial. *State v.*

*Giordano,* 440 A.2d 742, 745 (R.I.1982). In *Giordano* this court stated:

"Our careful review of the present record satisfies us that none of the trial justice's questions advocated the state's position or conveyed his own opinion about the credibility or the weight of the testimony * * *. Furthermore, in this case the trial justice instructed the jurors to use their own recollections of the evidence to arrive at a conclusion. He warned them not to be influenced by anything else. * * * [That] instruction reinforces our conclusion that the tenor of the trial justice's questioning contained no prejudicial influences." *Id.* at 746.

In the case at bar the trial justice's neutral demeanor throughout the trial and his instructions to the jurors lead to the inevitable conclusion that the questions posed by the trial justice did not in any way intrude upon the province of the jury or prejudice the defendant. The defendant's argument is wholly unpersuasive, and the single issue on which this appeal is predicated is altogether lacking in merit.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers in the case are remanded to the Superior Court.

BOURCIER and FLANDERS, JJ., did not participate.