# CITY OF ERIE ET AL. *v.* PAP'S A. M., TDBA "KANDYLAND"

No. 98–1161.   Argued November 10, 1999—Decided March 29, 2000

278

280

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which REHNQUIST, C. J., and KENNEDY, SOUTER, and BREYER, JJ., joined, and an opinion with respect to Parts III and IV, in which REHNQUIST, C. J., and KENNEDY and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 302. SOUTER, J., filed an opinion concurring in part and dissenting in part, *post*, p. 310. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 317.

*Gregory A. Karle* argued the cause for petitioners. With him on the briefs were *Gerald J. Villella* and *Valerie J. Sprenkle*.

*John H. Weston* argued the cause for respondent. With him on the briefs were *G. Randall Garrou, Philip B. Friedman,* and *Cathy Crosson.** 

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, and an opinion with respect to Parts III and IV, in which THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE BREYER join.

The city of Erie, Pennsylvania, enacted an ordinance banning public nudity. Respondent Pap's A. M. (hereinafter

---

*Briefs of *amici curiae* urging reversal were filed for Brevard County, Florida, by *Scott L. Knox;* for the American Liberties Institute et al. by *Frederick H. Nelson, Lonnie N. Groot,* and *Anthony A. Garganese;* for Erie County Citizen's Coalition Against Violent Pornography by *Keith O. Barrows;* for Morality in Media, Inc., et al. by *Paul J. McGeady, Bruce A. Taylor,* and *Janet M. LaRue;* and for the National Family Legal Foundation by *Len L. Munsil.*

Briefs of *amici curiae* urging affirmance were filed for the American Association for Nude Recreation by *Robert T. Page;* for the American Civil Liberties Union et al. by *Steven R. Shapiro, Witold J. Walczak, Bruce J. Ennis, Jr.,* and *Paul M. Smith;* for Deja Vu Consulting, Inc., et al. by *Bradley J. Shafer;* for Feminists for Free Expression by *Mary D. Dorman;* for the First Amendment Lawyers Association by *Randall D. B. Tigue, Steven H. Swander,* and *Richard L. Wilson;* for the Thomas Jefferson Center for Protection of Free Expression et al. by *J. Joshua Wheeler;* and for Bill Conte, on behalf of *The Dante Project: Inferno* et al. by *Jack R. Burns.*

Briefs of *amici curiae* were filed for the State of Kansas et al. by *Carla J. Stovall,* Attorney General of Kansas, *Stephen R. McAllister,* State Solicitor, *Betty D. Montgomery,* Attorney General of Ohio, *Edward B. Foley,* State Solicitor, and *Elise Porter,* Assistant Solicitor, and by the Attorneys General for their respective States as follows: *Alan G. Lance* of Idaho, *Richard P. Ieyoub* of Louisiana, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Jan Graham* of Utah, and *Mark L. Earley* of Virginia; and for Orange County, Florida, by *Joel D. Prinsell.*

Pap's), which operated a nude dancing establishment in Erie, challenged the constitutionality of the ordinance and sought a permanent injunction against its enforcement. The Pennsylvania Supreme Court, although noting that this Court in *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991), had upheld an Indiana ordinance that was "strikingly similar" to Erie's, found that the public nudity sections of the ordinance violated respondent's right to freedom of expression under the United States Constitution. 553 Pa. 348, 356, 719 A. 2d 273, 277 (1998). This case raises the question whether the Pennsylvania Supreme Court properly evaluated the ordinance's constitutionality under the First Amendment. We hold that Erie's ordinance is a content-neutral regulation that satisfies the four-part test of *United States* v. *O'Brien*, 391 U. S. 367 (1968). Accordingly, we reverse the decision of the Pennsylvania Supreme Court and remand for the consideration of any remaining issues.

I

On September 28, 1994, the city council for the city of Erie, Pennsylvania, enacted Ordinance 75–1994, a public indecency ordinance that makes it a summary offense to knowingly or intentionally appear in public in a "state of nudity."*

---

*Ordinance 75–1994, codified as Article 711 of the Codified Ordinances of the city of Erie, provides in relevant part:

"1. A person who knowingly or intentionally, in a public place:

"a. engages in sexual intercourse

"b. engages in deviate sexual intercourse as defined by the Pennsylvania Crimes Code

"c. appears in a state of nudity, or

"d. fondles the genitals of himself, herself or another person commits Public Indecency, a Summary Offense.

"2. "Nudity" means the showing of the human male or female genital [*sic*], pubic area or buttocks with less than a fully opaque covering; the showing of the female breast with less than a fully opaque covering of any part of the nipple; the exposure of any device, costume, or covering which gives the appearance of or simulates the genitals, pubic hair, natal cleft,

Respondent Pap's, a Pennsylvania corporation, operated an establishment in Erie known as "Kandyland" that featured totally nude erotic dancing performed by women. To comply with the ordinance, these dancers must wear, at a minimum, "pasties" and a "G-string." On October 14, 1994, two days after the ordinance went into effect, Pap's filed a complaint against the city of Erie, the mayor of the city, and members of the city council, seeking declaratory relief and a permanent injunction against the enforcement of the ordinance.

The Court of Common Pleas of Erie County granted the permanent injunction and struck down the ordinance as unconstitutional. Civ. No. 60059–1994 (Jan. 18, 1995), Pet. for Cert. 40a. On cross appeals, the Commonwealth Court reversed the trial court's order. 674 A. 2d 338 (1996).

The Pennsylvania Supreme Court granted review and reversed, concluding that the public nudity provisions of the ordinance violated respondent's rights to freedom of expression as protected by the First and Fourteenth Amendments. 553 Pa. 348, 719 A. 2d 273 (1998). The Pennsylvania court first inquired whether nude dancing constitutes expressive conduct that is within the protection of the First Amendment. The court noted that the act of being nude, in and of

perineum anal region or pubic hair region; or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of nipples and/or areola.

"3. "Public Place" includes all outdoor places owned by or open to the general public, and all buildings and enclosed places owned by or open to the general public, including such places of entertainment, taverns, restaurants, clubs, theaters, dance halls, banquet halls, party rooms or halls limited to specific members, restricted to adults or to patrons invited to attend, whether or not an admission charge is levied.

"4. The prohibition set forth in subsection 1(c) shall not apply to:

"a. Any child under ten (10) years of age; or

"b. Any individual exposing a breast in the process of breastfeeding an infant under two (2) years of age."

itself, is not entitled to First Amendment protection because it conveys no message. *Id.,* at 354, 719 A. 2d, at 276. Nude dancing, however, is expressive conduct that is entitled to some quantum of protection under the First Amendment, a view that the Pennsylvania Supreme Court noted was endorsed by eight Members of this Court in *Barnes.* 553 Pa., at 354, 719 A. 2d, at 276.

The Pennsylvania court next inquired whether the government interest in enacting the ordinance was content neutral, explaining that regulations that are unrelated to the suppression of expression are not subject to strict scrutiny but to the less stringent standard of *United States* v. *O'Brien, supra,* at 377. To answer the question whether the ordinance is content based, the court turned to our decision in *Barnes.* 553 Pa., at 355–356, 719 A. 2d, at 277. Although the Pennsylvania court noted that the Indiana statute at issue in *Barnes* "is strikingly similar to the Ordinance we are examining," it concluded that "[u]nfortunately for our purposes, the *Barnes* Court splintered and produced four separate, non-harmonious opinions." 553 Pa., at 356, 719 A. 2d, at 277. After canvassing these separate opinions, the Pennsylvania court concluded that, although it is permissible to find precedential effect in a fragmented decision, to do so a majority of the Court must have been in agreement on the concept that is deemed to be the holding. See *Marks* v. *United States,* 430 U. S. 188 (1977). The Pennsylvania court noted that "aside from the agreement by a majority of the *Barnes* Court that nude dancing is entitled to some First Amendment protection, we can find no point on which a majority of the *Barnes* Court agreed." 553 Pa., at 358, 719 A. 2d, at 278. Accordingly, the court concluded that "no clear precedent arises out of *Barnes* on the issue of whether the [Erie] ordinance . . . passes muster under the First Amendment." *Ibid.*

Having determined that there was no United States Supreme Court precedent on point, the Pennsylvania court

conducted an independent examination of the ordinance to ascertain whether it was related to the suppression of expression. The court concluded that although one of the purposes of the ordinance was to combat negative secondary effects, "[i]nextricably bound up with this stated purpose is an unmentioned purpose . . . to impact negatively on the erotic message of the dance." *Id.*, at 359, 719 A. 2d, at 279. As such, the court determined the ordinance was content based and subject to strict scrutiny. The ordinance failed the narrow tailoring requirement of strict scrutiny because the court found that imposing criminal and civil sanctions on those who commit sex crimes would be a far narrower means of combating secondary effects than the requirement that dancers wear pasties and G-strings. *Id.*, at 361–362, 719 A. 2d, at 280.

Concluding that the ordinance unconstitutionally burdened respondent's expressive conduct, the Pennsylvania court then determined that, under Pennsylvania law, the public nudity provisions of the ordinance could be severed rather than striking the ordinance in its entirety. Accordingly, the court severed §§ 1(c) and 2 from the ordinance and reversed the order of the Commonwealth Court. *Id.*, at 363–364, 719 A. 2d, at 281. Because the court determined that the public nudity provisions of the ordinance violated Pap's right to freedom of expression under the United States Constitution, it did not address the constitutionality of the ordinance under the Pennsylvania Constitution or the claim that the ordinance is unconstitutionally overbroad. *Ibid.*

In a separate concurrence, two justices of the Pennsylvania court noted that, because this Court upheld a virtually identical statute in *Barnes*, the ordinance should have been upheld under the United States Constitution. 553 Pa., at 364, 719 A. 2d, at 281. They reached the same result as the majority, however, because they would have held that the public nudity sections of the ordinance violate the Pennsylvania Constitution. *Id.*, at 370, 719 A. 2d, at 284.

The city of Erie petitioned for a writ of certiorari, which we granted. 526 U. S. 1111 (1999). Shortly thereafter, Pap's filed a motion to dismiss the case as moot, noting that Kandyland was no longer operating as a nude dancing club, and Pap's was not operating a nude dancing club at any other location. Respondent's Motion to Dismiss as Moot 1. We denied the motion. 527 U. S. 1034 (1999).

## II

As a preliminary matter, we must address the justiciability question. " '[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *County of Los Angeles* v. *Davis*, 440 U. S. 625, 631 (1979) (quoting *Powell* v. *McCormack*, 395 U. S. 486, 496 (1969)). The underlying concern is that, when the challenged conduct ceases such that " 'there is no reasonable expectation that the wrong will be repeated,' " *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953), then it becomes impossible for the court to grant " 'any effectual relief whatever' to [the] prevailing party," *Church of Scientology of Cal.* v. *United States*, 506 U. S. 9, 12 (1992) (quoting *Mills* v. *Green*, 159 U. S. 651, 653 (1895)). In that case, any opinion as to the legality of the challenged action would be advisory.

Here, Pap's submitted an affidavit stating that it had "ceased to operate a nude dancing establishment in Erie." Status Report Re Potential Issue of Mootness 1 (Sept. 8, 1999). Pap's asserts that the case is therefore moot because "[t]he outcome of this case will have no effect upon Respondent." Respondent's Motion to Dismiss as Moot 1. Simply closing Kandyland is not sufficient to render this case moot, however. Pap's is still incorporated under Pennsylvania law, and it could again decide to operate a nude dancing establishment in Erie. See Petitioner's Brief in Opposition to Motion to Dismiss 3. JUSTICE SCALIA differs with our assessment as to the likelihood that Pap's may resume its nude dancing

operation. Several Members of this Court can attest, however, that the "advanced age" of Pap's owner (72) does not make it "absolutely clear" that a life of quiet retirement is his only reasonable expectation. Cf. *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167 (2000). Moreover, our appraisal of Pap's affidavit is influenced by Pap's failure, despite its obligation to the Court, to mention a word about the potential mootness issue in its brief in opposition to the petition for writ of certiorari, which was filed in April 1999, even though, as JUSTICE SCALIA points out, Kandyland was closed and that property sold in 1998. See *Board of License Comm'rs of Tiverton* v. *Pastore*, 469 U. S. 238, 240 (1985) *(per curiam)*. Pap's only raised the issue after this Court granted certiorari.

In any event, this is not a run of the mill voluntary cessation case. Here it is the plaintiff who, having prevailed below, now seeks to have the case declared moot. And it is the city of Erie that seeks to invoke the federal judicial power to obtain this Court's review of the Pennsylvania Supreme Court decision. Cf. *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 617–618 (1989). The city has an ongoing injury because it is barred from enforcing the public nudity provisions of its ordinance. If the challenged ordinance is found constitutional, then Erie can enforce it, and the availability of such relief is sufficient to prevent the case from being moot. See *Church of Scientology of Cal.* v. *United States, supra,* at 13. And Pap's still has a concrete stake in the outcome of this case because, to the extent Pap's has an interest in resuming operations, it has an interest in preserving the judgment of the Pennsylvania Supreme Court. Our interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review further counsels against a finding of mootness here. See *United States* v. *W. T. Grant Co., supra,* at 632; cf. *Arizonans for Official English* v. *Arizona,* 520 U. S. 43,

74 (1997). Although the issue is close, we conclude that the case is not moot, and we turn to the merits.

## III

Being "in a state of nudity" is not an inherently expressive condition. As we explained in *Barnes*, however, nude dancing of the type at issue here is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection. See *Barnes* v. *Glen Theatre, Inc.*, 501 U. S., at 565–566 (plurality opinion); *Schad* v. *Mount Ephraim*, 452 U. S. 61, 66 (1981).

To determine what level of scrutiny applies to the ordinance at issue here, we must decide "whether the State's regulation is related to the suppression of expression." *Texas* v. *Johnson*, 491 U. S. 397, 403 (1989); see also *United States* v. *O'Brien*, 391 U. S., at 377. If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the "less stringent" standard from *O'Brien* for evaluating restrictions on symbolic speech. *Texas* v. *Johnson, supra*, at 403; *United States* v. *O'Brien, supra*, at 377. If the government interest is related to the content of the expression, however, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard. *Texas* v. *Johnson, supra*, at 403.

In *Barnes*, we analyzed an almost identical statute, holding that Indiana's public nudity ban did not violate the First Amendment, although no five Members of the Court agreed on a single rationale for that conclusion. We now clarify that government restrictions on public nudity such as the ordinance at issue here should be evaluated under the framework set forth in *O'Brien* for content-neutral restrictions on symbolic speech.

The city of Erie argues that the ordinance is a content-neutral restriction that is reviewable under *O'Brien* because the ordinance bans conduct, not speech; specifically, public

nudity. Respondent counters that the ordinance targets nude dancing and, as such, is aimed specifically at suppressing expression, making the ordinance a content-based restriction that must be subjected to strict scrutiny.

The ordinance here, like the statute in *Barnes,* is on its face a general prohibition on public nudity. 553 Pa., at 354, 719 A. 2d, at 277. By its terms, the ordinance regulates conduct alone. It does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity. And like the statute in *Barnes,* the Erie ordinance replaces and updates provisions of an "Indecency and Immorality" ordinance that has been on the books since 1866, predating the prevalence of nude dancing establishments such as Kandyland. Pet. for Cert. 7a; see *Barnes* v. *Glen Theatre, Inc., supra,* at 568.

Respondent and JUSTICE STEVENS contend nonetheless that the ordinance is related to the suppression of expression because language in the ordinance's preamble suggests that its actual purpose is to prohibit erotic dancing of the type performed at Kandyland. *Post,* at 318 (dissenting opinion). That is not how the Pennsylvania Supreme Court interpreted that language, however. In the preamble to the ordinance, the city council stated that it was adopting the regulation

> "'for the purpose of limiting a recent increase in nude live entertainment within the City, which activity adversely impacts and threatens to impact on the public health, safety and welfare by providing an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects.'" 553 Pa., at 359, 719 A. 2d, at 279.

The Pennsylvania Supreme Court construed this language to mean that one purpose of the ordinance was "to combat negative secondary effects." *Ibid.*

As JUSTICE SOUTER noted in *Barnes*, "on its face, the governmental interest in combating prostitution and other criminal activity is not at all inherently related to expression." 501 U. S., at 585 (opinion concurring in judgment).   In that sense, this case is similar to *O'Brien*.   O'Brien burned his draft registration card as a public statement of his antiwar views, and he was convicted under a statute making it a crime to knowingly mutilate or destroy such a card.   This Court rejected his claim that the statute violated his First Amendment rights, reasoning that the law punished him for the "noncommunicative impact of his conduct, and for nothing else."  391 U. S., at 382.   In other words, the Government regulation prohibiting the destruction of draft cards was aimed at maintaining the integrity of the Selective Service System and not at suppressing the message of draft resistance that O'Brien sought to convey by burning his draft card.   So too here, the ordinance prohibiting public nudity is aimed at combating crime and other negative secondary effects caused by the presence of adult entertainment establishments like Kandyland and not at suppressing the erotic message conveyed by this type of nude dancing.   Put another way, the ordinance does not attempt to regulate the primary effects of the expression, *i. e.*, the effect on the audience of watching nude erotic dancing, but rather the secondary effects, such as the impacts on public health, safety, and welfare, which we have previously recognized are "caused by the presence of even one such" establishment.   *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 47–48, 50 (1986); see also *Boos* v. *Barry*, 485 U. S. 312, 321 (1988).

Although the Pennsylvania Supreme Court acknowledged that one goal of the ordinance was to combat the negative secondary effects associated with nude dancing establishments, the court concluded that the ordinance was nevertheless content based, relying on Justice White's position in dissent in *Barnes* for the proposition that a ban of this type *necessarily* has the purpose of suppressing the erotic mes-

sage of the dance. Because the Pennsylvania court agreed with Justice White's approach, it concluded that the ordinance must have another, "unmentioned" purpose related to the suppression of expression. 553 Pa., at 359, 719 A. 2d, at 279. That is, the Pennsylvania court adopted the dissent's view in *Barnes* that " '[s]ince the State permits the dancers to perform if they wear pasties and G-strings but forbids nude dancing, it is precisely because of the distinctive, expressive content of the nude dancing performances at issue in this case that the State seeks to apply the statutory prohibition." 553 Pa., at 359, 719 A. 2d, at 279 (quoting *Barnes, supra,* at 592 (White, J., dissenting)). A majority of the Court rejected that view in *Barnes,* and we do so again here.

Respondent's argument that the ordinance is "aimed" at suppressing expression through a ban on nude dancing—an argument that respondent supports by pointing to statements by the city attorney that the public nudity ban was not intended to apply to "legitimate" theater productions— is really an argument that the city council also had an illicit motive in enacting the ordinance. As we have said before, however, this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive. *O'Brien, supra,* at 382–383; *Renton* v. *Playtime Theatres, Inc., supra,* at 47–48 (that the "predominate" purpose of the statute was to control secondary effects was "more than adequate to establish" that the city's interest was unrelated to the suppression of expression). In light of the Pennsylvania court's determination that one purpose of the ordinance is to combat harmful secondary effects, the ban on public nudity here is no different from the ban on burning draft registration cards in *O'Brien,* where the Government sought to prevent the means of the expression and not the expression of antiwar sentiment itself.

JUSTICE STEVENS argues that the ordinance enacts a complete ban on expression. We respectfully disagree with that characterization. The public nudity ban certainly has

the effect of limiting one particular means of expressing the kind of erotic message being disseminated at Kandyland. But simply to define what is being banned as the "message" is to assume the conclusion. We did not analyze the regulation in *O'Brien* as having enacted a total ban on expression. Instead, the Court recognized that the regulation against destroying one's draft card was justified by the Government's interest in preventing the harmful "secondary effects" of that conduct (disruption to the Selective Service System), even though that regulation may have some incidental effect on the expressive element of the conduct. Because this justification was unrelated to the suppression of O'Brien's antiwar message, the regulation was content neutral. Although there may be cases in which banning the means of expression so interferes with the message that it essentially bans the message, that is not the case here.

Even if we had not already rejected the view that a ban on public nudity is necessarily related to the suppression of the erotic message of nude dancing, we would do so now because the premise of such a view is flawed. The State's interest in preventing harmful secondary effects is not related to the suppression of expression. In trying to control the secondary effects of nude dancing, the ordinance seeks to deter crime and the other deleterious effects caused by the presence of such an establishment in the neighborhood. See *Renton, supra*, at 50–51. In *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984), we held that a National Park Service regulation prohibiting camping in certain parks did not violate the First Amendment when applied to prohibit demonstrators from sleeping in Lafayette Park and the Mall in Washington, D. C., in connection with a demonstration intended to call attention to the plight of the homeless. Assuming, *arguendo*, that sleeping can be expressive conduct, the Court concluded that the Government interest in conserving park property was unrelated to the demonstrators' message about homelessness. *Id.*, at 299.

So, while the demonstrators were allowed to erect "symbolic tent cities," they were not allowed to sleep overnight in those tents. Even though the regulation may have directly limited the expressive element involved in actually sleeping in the park, the regulation was nonetheless content neutral.

Similarly, even if Erie's public nudity ban has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, the dancers at Kandyland and other such establishments are free to perform wearing pasties and G-strings. Any effect on the overall expression is *de minimis*. And as JUSTICE STEVENS eloquently stated for the plurality in *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 70 (1976), "even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate," and "few of us would march our sons and daughters off to war to preserve the citizen's right to see" specified anatomical areas exhibited at establishments like Kandyland. If States are to be able to regulate secondary effects, then *de minimis* intrusions on expression such as those at issue here cannot be sufficient to render the ordinance content based. See *Clark* v. *Community for Creative Non-Violence, supra,* at 299; *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989) (even if regulation has an incidental effect on some speakers or messages but not others, the regulation is content neutral if it can be justified without reference to the content of the expression).

This case is, in fact, similar to *O'Brien, Community for Creative Non-Violence,* and *Ward.* The justification for the government regulation in each case prevents harmful "secondary" effects that are unrelated to the suppression of expression. See, *e. g., Ward* v. *Rock Against Racism, supra,* at 791–792 (noting that "[t]he principal justification for the

sound-amplification guideline is the city's desire to control noise levels at bandshell events, in order to retain the character of the [adjacent] Sheep Meadow and its more sedate activities," and citing *Renton* for the proposition that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others"). While the doctrinal theories behind "incidental burdens" and "secondary effects" are, of course, not identical, there is nothing objectionable about a city passing a general ordinance to ban public nudity (even though such a ban may place incidental burdens on some protected speech) and at the same time recognizing that one specific occurrence of public nudity—nude erotic dancing—is particularly problematic because it produces harmful secondary effects.

JUSTICE STEVENS claims that today we "[f]or the first time" extend *Renton*'s secondary effects doctrine to justify restrictions other than the location of a commercial enterprise. *Post*, at 317 (dissenting opinion). Our reliance on *Renton* to justify other restrictions is not new, however. In *Ward*, the Court relied on *Renton* to evaluate restrictions on sound amplification at an outdoor bandshell, rejecting the dissent's contention that *Renton* was inapplicable. See *Ward* v. *Rock Against Racism, supra*, at 804, n. 1 (Marshall, J., dissenting) ("Today, for the first time, a majority of the Court applies *Renton* analysis to a category of speech far afield from that decision's original limited focus"). Moreover, Erie's ordinance does not effect a "total ban" on protected expression. *Post*, at 319.

In *Renton*, the regulation explicitly treated "adult" movie theaters differently from other theaters, and defined "adult" theaters solely by reference to the content of their movies. 475 U. S., at 44. We nonetheless treated the zoning regulation as content neutral because the ordinance was aimed at the secondary effects of adult theaters, a justification unrelated to the content of the adult movies themselves. *Id.*, at

48. Here, Erie's ordinance is on its face a content-neutral restriction on conduct. Even if the city thought that nude dancing at clubs like Kandyland constituted a particularly problematic instance of public nudity, the regulation is still properly evaluated as a content-neutral restriction because the interest in combating the secondary effects associated with those clubs is unrelated to the suppression of the erotic message conveyed by nude dancing.

We conclude that Erie's asserted interest in combating the negative secondary effects associated with adult entertainment establishments like Kandyland is unrelated to the suppression of the erotic message conveyed by nude dancing. The ordinance prohibiting public nudity is therefore valid if it satisfies the four-factor test from *O'Brien* for evaluating restrictions on symbolic speech.

## IV

Applying that standard here, we conclude that Erie's ordinance is justified under *O'Brien*. The first factor of the *O'Brien* test is whether the government regulation is within the constitutional power of the government to enact. Here, Erie's efforts to protect public health and safety are clearly within the city's police powers. The second factor is whether the regulation furthers an important or substantial government interest. The asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing are undeniably important. And in terms of demonstrating that such secondary effects pose a threat, the city need not "conduct new studies or produce evidence independent of that already generated by other cities" to demonstrate the problem of secondary effects, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Renton* v. *Playtime Theatres, Inc., supra,* at 51–52. Because the nude dancing at Kandyland is of the same character as the adult entertain-

ment at issue in *Renton*, *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976); and *California* v. *LaRue*, 409 U. S. 109 (1972), it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects. And Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theatres* to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood. See *Renton* v. *Playtime Theatres, Inc.*, *supra*, at 51–52 (indicating that reliance on a judicial opinion that describes the evidentiary basis is sufficient). In fact, Erie expressly relied on *Barnes* and its discussion of secondary effects, including its reference to *Renton* and *American Mini Theatres*. Even in cases addressing regulations that strike closer to the core of First Amendment values, we have accepted a state or local government's reasonable belief that the experience of other jurisdictions is relevant to the problem it is addressing. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 393, n. 6 (2000). Regardless of whether JUSTICE SOUTER now wishes to disavow his opinion in *Barnes* on this point, see *post*, at 316–317 (opinion concurring in part and dissenting in part), the evidentiary standard described in *Renton* controls here, and Erie meets that standard.

In any event, Erie also relied on its own findings. The preamble to the ordinance states that "the Council of the City of Erie *has, at various times over more than a century, expressed its findings* that certain lewd, immoral activities carried on in public places for profit are highly detrimental to the public health, safety and welfare, and lead to the debasement of both women and men, promote violence, public intoxication, prostitution and other serious criminal activity." Pet. for Cert. 6a (emphasis added). The city council members, familiar with commercial downtown Erie, are the individuals who would likely have had firsthand knowledge of what took place at and around nude dancing establish-

ments in Erie, and can make particularized, expert judgments about the resulting harmful secondary effects. Analogizing to the administrative agency context, it is well established that, as long as a party has an opportunity to respond, an administrative agency may take official notice of such "legislative facts" within its special knowledge, and is not confined to the evidence in the record in reaching its expert judgment. See *FCC* v. *National Citizens Comm. for Broadcasting*, 436 U. S. 775 (1978); *Republic Aviation Corp.* v. *NLRB*, 324 U. S. 793 (1945); 2 K. Davis & R. Pierce, Administrative Law Treatise § 10.6 (3d ed. 1994). Here, Kandyland has had ample opportunity to contest the council's findings about secondary effects—before the council itself, throughout the state proceedings, and before this Court. Yet to this day, Kandyland has never challenged the city council's findings or cast any specific doubt on the validity of those findings. Instead, it has simply asserted that the council's evidentiary proof was lacking. In the absence of any reason to doubt it, the city's expert judgment should be credited. And the study relied on by *amicus curiae* does not cast any legitimate doubt on the Erie city council's judgment about Erie. See Brief for First Amendment Lawyers Association as *Amicus Curiae* 16–23.

Finally, it is worth repeating that Erie's ordinance is on its face a content-neutral restriction that regulates conduct, not First Amendment expression. And the government should have sufficient leeway to justify such a law based on secondary effects. On this point, *O'Brien* is especially instructive. The Court there did not require evidence that the integrity of the Selective Service System would be jeopardized by the knowing destruction or mutilation of draft cards. It simply reviewed the Government's various administrative interests in issuing the cards, and then concluded that "Congress has a legitimate and substantial interest in preventing their wanton and unrestrained destruction and assuring their continuing availability by punishing people

who knowingly and willfully destroy or mutilate them." 391 U. S., at 378–380. There was no study documenting instances of draft card mutilation or the actual effect of such mutilation on the Government's asserted efficiency interests. But the Court permitted Congress to take official notice, as it were, that draft card destruction would jeopardize the system. The fact that this sort of leeway is appropriate in a case involving conduct says nothing whatsoever about its appropriateness in a case involving actual regulation of First Amendment expression. As we have said, so long as the regulation is unrelated to the suppression of expression, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas* v. *Johnson*, 491 U. S., at 406. See, *e. g.*, *United States* v. *O'Brien*, *supra*, at 377; *United States* v. *Albertini*, 472 U. S. 675, 689 (1985) (finding sufficient the Government's assertion that those who had previously been barred from entering the military installation pose a threat to the security of that installation); *Clark* v. *Community for Creative Non-Violence*, 468 U. S., at 299 (finding sufficient the Government's assertion that camping overnight in the park poses a threat to park property).

JUSTICE SOUTER, however, would require Erie to develop a specific evidentiary record supporting its ordinance. *Post*, at 317 (opinion concurring in part and dissenting in part). JUSTICE SOUTER agrees that Erie's interest in combating the negative secondary effects associated with nude dancing establishments is a legitimate government interest unrelated to the suppression of expression, and he agrees that the ordinance should therefore be evaluated under *O'Brien*. *O'Brien*, of course, required no evidentiary showing at all that the threatened harm was real. But that case is different, JUSTICE SOUTER contends, because in *O'Brien* "there could be no doubt" that a regulation prohibiting the destruction of draft cards would alleviate the harmful secondary ef-

fects flowing from the destruction of those cards. *Post*, at 311, n. 1.

But whether the harm is evident to our "intuition," *ibid.*, is not the proper inquiry. If it were, we would simply say there is no doubt that a regulation prohibiting public nudity would alleviate the harmful secondary effects associated with nude dancing. In any event, JUSTICE SOUTER conflates two distinct concepts under *O'Brien:* whether there is a substantial government interest and whether the regulation furthers that interest. As to the government interest, *i. e.*, whether the threatened harm is real, the city council relied on this Court's opinions detailing the harmful secondary effects caused by establishments like Kandyland, as well as on its own experiences in Erie. JUSTICE SOUTER attempts to denigrate the city council's conclusion that the threatened harm was real, arguing that we cannot accept Erie's findings because the subject of nude dancing is "fraught with some emotionalism," *post*, at 314. Yet surely the subject of drafting our citizens into the military is "fraught" with more emotionalism than the subject of regulating nude dancing. *Ibid.* JUSTICE SOUTER next hypothesizes that the reason we cannot accept Erie's conclusion is that, since the question whether these secondary effects occur is "amenable to empirical treatment," we should ignore Erie's actual experience and instead require such an empirical analysis. *Post*, at 314–315, n. 3 (referring to a "scientifically sound" study offered by an *amicus curiae* to show that nude dancing establishments do not cause secondary effects). In *Nixon*, however, we flatly rejected that idea. 528 U. S., at 394 (noting that the "invocation of academic studies said to indicate" that the threatened harms are not real is insufficient to cast doubt on the experience of the local government).

As to the second point—whether the regulation furthers the government interest—it is evident that, since crime and other public health and safety problems are caused by the presence of nude dancing establishments like Kandyland, a

ban on such nude dancing would further Erie's interest in preventing such secondary effects. To be sure, requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects, but *O'Brien* requires only that the regulation further the interest in combating such effects. Even though the dissent questions the wisdom of Erie's chosen remedy, *post*, at 323 (opinion of STEVENS, J.), the "'city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems,'" *Renton* v. *Playtime Theatres, Inc.*, 475 U. S., at 52 (quoting *American Mini Theatres*, 427 U. S., at 71 (plurality opinion)). It also may be true that a pasties and G-string requirement would not be as effective as, for example, a requirement that the dancers be fully clothed, but the city must balance its efforts to address the problem with the requirement that the restriction be no greater than necessary to further the city's interest.

The ordinance also satisfies *O'Brien*'s third factor, that the government interest is unrelated to the suppression of free expression, as discussed *supra*, at 289–296. The fourth and final *O'Brien* factor—that the restriction is no greater than is essential to the furtherance of the government interest— is satisfied as well. The ordinance regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis*. The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message. See *Barnes* v. *Glen Theatre, Inc.*, 501 U. S., at 572 (plurality opinion of REHNQUIST, C. J., joined by O'CONNOR and KENNEDY, JJ.); *id.*, at 587 (SOUTER, J., concurring in judgment). JUSTICE SOUTER points out that zoning is an alternative means of addressing this problem. It is far from clear, however, that zoning imposes less of a burden on expression than the minimal requirement implemented here. In any event, since this is a content-neutral restriction, least restrictive

means analysis is not required.    See *Ward*, 491 U. S., at 798–799, n. 6.

We hold, therefore, that Erie's ordinance is a content-neutral regulation that is valid under *O'Brien*.    Accordingly, the judgment of the Pennsylvania Supreme Court is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I

In my view, the case before us here is moot.    The Court concludes that it is not because respondent could resume its nude dancing operations in the future, and because petitioners have suffered an ongoing, redressable harm consisting of the state court's invalidation of their public nudity ordinance.

As to the first point: Petitioners do not dispute that Kandyland no longer exists; the building in which it was located has been sold to a real estate developer, and the premises are currently being used as a comedy club.    We have a sworn affidavit from respondent's sole shareholder, Nick Panos, to the effect that Pap's "operates no active business," and is "a 'shell' corporation."    More to the point, Panos swears that neither Pap's nor Panos "employ[s] any individuals involved in the nude dancing business," "maintain[s] any contacts in the adult entertainment business," "has any current interest in any establishment providing nude dancing," or "has any intention to own or operate a nude dancing establishment in the future."[1]    App. to Reply to Brief in Opposition to Motion to Dismiss 7–8.

---

[1] Curiously, the Court makes no mention of Panos' averment of no intention to operate a nude dancing establishment in the future, but discusses the issue as though the only factor suggesting mootness is the closing of Kandyland.    *Ante*, at 287–288.    I see no basis for ignoring this aver-

Petitioners do not contest these representations, but offer in response only that Pap's *could* very easily get back into the nude dancing business. The Court adopts petitioners' line, concluding that because respondent is still incorporated in Pennsylvania, it "could again decide to operate a nude dancing establishment in Erie." *Ante*, at 287. That plainly does not suffice under our cases. The test for mootness we have applied in voluntary-termination cases is not whether the action originally giving rise to the controversy could not *conceivably* reoccur, but whether it is "absolutely clear that the . . . behavior could not *reasonably be expected to recur.*" *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U. S. 199, 203 (1968) (emphasis added). Here I think that test is met. According to Panos' uncontested sworn affidavit, Pap's ceased doing business at Kandyland, and the premises were sold to an independent developer, in 1998— the year before the petition for certiorari in this case was filed. It strains credulity to suppose that the 72-year-old Mr. Panos shut down his going business *after* securing his victory in the Pennsylvania Supreme Court, and before the city's petition for certiorari was even filed, in order to increase his chances of preserving his judgment in the statistically unlikely event that a (not yet filed) petition might be granted. Given the timing of these events, given the fact that respondent has no existing interest in nude dancing (or in any other business), given Panos' sworn representation that he does not intend to invest—through Pap's or otherwise—in any nude dancing business, and given Panos' ad-

---

ment. The only fact mentioned by the Court to justify regarding it as perjurious is that respondent failed to raise mootness in its brief in opposition to the petition for certiorari. That may be good basis for censure, but it is scant basis for suspicion of perjury—particularly since respondent, far from seeking to "insulate a favorable decision from review," *ante*, at 288, asks us in light of the mootness to vacate the judgment below. Reply to Brief in Opposition to Motion to Dismiss 5.

vanced age,[2] it seems to me that there is "no reasonable *expectation*," even if there remains a theoretical possibility, that Pap's will resume nude dancing operations in the future.[3]

The situation here is indistinguishable from that which obtained in *Arizonans for Official English* v. *Arizona,* 520 U. S. 43 (1997), where the plaintiff-respondent, a state employee who had sued to enjoin enforcement of an amendment to the Arizona Constitution making English that State's official language, had resigned her public-sector employment. We held the case moot and, since the mootness was attributable to the "'unilateral action of the party who prevailed in the lower court,'" we followed our usual practice of vacating the favorable judgment respondent had obtained in the

---

[2] The Court asserts that "[s]everal Members of this Court can attest . . . that the 'advanced age'" of 72 "does not make it 'absolutely clear' that a life of quiet retirement is [one's] only reasonable expectation." *Ante,* at 288. That is *trés gallant,* but it misses the point. Now as heretofore, Justices in their seventies continue to do their work competently—indeed, perhaps better than their youthful colleagues because of the wisdom that age imparts. But to respond to my point, what the Court requires is citation of an instance in which a Member of this Court (or of any other court, for that matter) resigned at the age of 72 to begin a new career— or more remarkable still (for this is what the Court suspects the young Mr. Panos is up to) resigned at the age of 72 to go judge on a different court, of no greater stature, and located in Erie, Pennsylvania, rather than Palm Springs. I base my assessment of reasonable expectations not upon Mr. Panos' age alone, but upon that combined with his sale of the business and his assertion, under oath, that he does not intend to enter another.

[3] It is significant that none of the assertions of Panos' affidavit is contested. Those pertaining to the sale of Kandyland and the current noninvolvement of Pap's in any other nude dancing establishment would seem readily verifiable by petitioners. The statements regarding Pap's and Panos' intentions for the future are by their nature not verifiable, and it would be reasonable not to credit them if *either* petitioners asserted some reason to believe they were not true *or* they were not rendered highly plausible by Panos' age and his past actions. Neither condition exists here.

Court of Appeals. *Id.*, at 72 (quoting *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership,* 513 U. S. 18, 23 (1994)).

The rub here is that this case comes to us on writ of certiorari to a state court, so that our lack of jurisdiction over the case also entails, according to our recent jurisprudence, a lack of jurisdiction to direct a vacatur. See *ASARCO Inc.* v. *Kadish,* 490 U. S. 605, 621, n. 1 (1989). The consequences of that limitation on our power are in this case significant: A dismissal for mootness caused by respondent's unilateral action would leave petitioners subject to an ongoing legal disability, and a large one at that. Because the Pennsylvania Supreme Court severed the public nudity provision from the ordinance, thus rendering it inoperative, the city would be prevented from enforcing its public nudity prohibition not only against respondent, should it decide to resume operations in the future, and not only against other nude dancing establishments, but against anyone who appears nude in public, regardless of the "expressiveness" of his conduct or his purpose in engaging in it.

That is an unfortunate consequence (which could be avoided, of course, if the Pennsylvania Supreme Court chose to vacate its judgments in cases that become moot during appeal). But it is not a consequence that authorizes us to entertain a suit the Constitution places beyond our power. And leaving in effect erroneous state determinations regarding the Federal Constitution is, after all, not unusual. It would have occurred here, even without the intervening mootness, if we had denied certiorari. And until the 1914 revision of the Judicial Code, it occurred *whenever* a state court erroneously sustained a federal constitutional challenge, since we did not even have *statutory* jurisdiction to entertain an appeal. Compare Judiciary Act of 1789, ch. 20, § 25, 1 Stat. 85–87, with Act of Dec. 23, 1914, ch. 2, 38 Stat. 790. In any event, the short of the matter is that we have no power to suspend the fundamental precepts that federal courts "are limited by the case-or-controversy requirement

of Art. III to adjudication of actual disputes between adverse parties," *Richardson* v. *Ramirez,* 418 U. S. 24, 36 (1974), and that this limitation applies "at all stages of review," *Preiser* v. *Newkirk,* 422 U. S. 395, 401 (1975) (quoting *Steffel* v. *Thompson,* 415 U. S. 452, 459, n. 10 (1974)) (internal quotation marks omitted).

Which brings me to the Court's second reason for holding that this case is still alive: The Court concludes that because petitioners have an "ongoing injury" caused by the state court's invalidation of its duly enacted public nudity provision, our ability to hear the case and reverse the judgment below is itself "sufficient to prevent the case from being moot." *Ante,* at 288. Although the Court does not cite any authority for the proposition that the burden of an adverse decision below suffices to keep a case alive, it is evidently relying upon our decision in *ASARCO,* which held that Article III's standing requirements were satisfied on writ of certiorari to a state court even though there would have been no Article III standing for the action producing the state judgment on which certiorari was sought. We assumed jurisdiction in the case because we concluded that the party seeking to invoke the federal judicial power had standing to challenge the adverse judgment entered against them by the state court. Because that judgment, if left undisturbed, would "caus[e] direct, specific, and concrete injury to the parties who petition for our review," *ASARCO,* 490 U. S., at 623–624, and because a decision by this Court to reverse the State Supreme Court would clearly redress that injury, we concluded that the original plaintiffs' lack of standing was not fatal to our jurisdiction, *id.,* at 624.

I dissented on this point in *ASARCO,* see *id.,* at 634 (REHNQUIST, C. J., concurring in part and dissenting in part, joined by SCALIA, J.), and remain of the view that it was incorrectly decided. But *ASARCO* at least did not purport to hold that the constitutional standing requirements of injury, causation, and redressability may be satisfied *solely* by

reference to the lower court's adverse judgment. It was careful to note—however illogical that might have been, see *id.*, at 635—that the parties "remain[ed] adverse," and that jurisdiction was proper only so long as the "requisites of a case or controversy are also met," *id.*, at 619, 624. Today the Court would appear to drop even this fig leaf.[4] In concluding that the injury to *Erie* is "sufficient" to keep this case alive, the Court performs the neat trick of identifying a "case or controversy" that has only one interested party.

## II

For the reasons set forth above, I would dismiss this case for want of jurisdiction. Because the Court resolves the threshold mootness question differently and proceeds to address the merits, I will do so briefly as well. I agree that the decision of the Pennsylvania Supreme Court must be reversed, but disagree with the mode of analysis the Court has applied.

The city of Erie self-consciously modeled its ordinance on the public nudity statute we upheld against constitutional challenge in *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991), calculating (one would have supposed reasonably) that the courts of Pennsylvania would consider themselves bound by our judgment on a question of federal constitutional law. In *Barnes*, I voted to uphold the challenged Indiana statute "not because it survives some lower level of First Amendment scrutiny, but because, as a general law regulating conduct and not specifically directed at expression, it is not

[4] I say "appear" because although the Court states categorically that "the availability of . . . relief [from the judgment below] is sufficient to prevent the case from being moot," it follows this statement, in the next sentence, with the assertion that Pap's, the state-court plaintiff, retains a "concrete stake in the outcome of this case." *Ante*, at 288. Of course, if the latter were true a classic case or controversy existed, and resort to the exotic theory of "standing by virtue of adverse judgment below" was entirely unnecessary.

subject to First Amendment scrutiny at all." *Id.,* at 572 (opinion concurring in judgment). Erie's ordinance, too, by its terms prohibits not merely nude dancing, but the act—irrespective of whether it is engaged in for expressive purposes—of going nude in public. The facts that a preamble to the ordinance explains that its purpose, in part, is to "limi[t] a recent increase in nude live entertainment," App. to Pet. for Cert. 42a, that city councilmembers in supporting the ordinance commented to that effect, see *post,* at 329–330, and n. 16 (STEVENS, J., dissenting), and that the ordinance includes in the definition of nudity the exposure of devices simulating that condition, see *post,* at 331, neither make the law any less general in its reach nor demonstrate that what the municipal authorities *really* find objectionable is expression rather than public nakedness. As far as appears (and as seems overwhelmingly likely), the preamble, the councilmembers' comments, and the chosen definition of the prohibited conduct simply reflect the fact that Erie had recently been having a public nudity problem not with streakers, sunbathers, or hot dog vendors, see *Barnes, supra,* at 574 (SCALIA, J., concurring in judgment), but with lap dancers.

There is no basis for the contention that the ordinance does not apply to nudity in theatrical productions such as Equus or Hair. Its text contains no such limitation. It was stipulated in the trial court that no effort was made to enforce the ordinance against a production of Equus involving nudity that was being staged in Erie at the time the ordinance became effective. App. 84. Notwithstanding JUSTICE STEVENS' assertion to the contrary, however, see *post,* at 328, neither in the stipulation, nor elsewhere in the record, does it appear that the city was aware of the nudity—and before this Court counsel for the city attributed nonenforcement not to a general exception for theatrical productions, but to the fact that no one had complained. Tr. of Oral Arg. 16. One instance of nonenforcement—against a play already in production that prosecutorial discretion might reasonably have

"grandfathered"—does not render this ordinance discriminatory on its face. To be sure, in the trial court counsel for the city said that "[t]o the extent that the expressive activity that is contained in [such] productions rises to a higher level of protected expression, they would not be [covered]," App. 53—but he rested this assertion upon the provision in the preamble that expressed respect for "fundamental Constitutional guarantees of free speech and free expression," and the provision of Paragraph 6 of the ordinance that provided for severability of unconstitutional provisions, *id.*, at 53–54.[5] What he was saying there (in order to fend off the overbreadth challenge of respondent, who was in no doubt that the ordinance *did* cover theatrical productions, see *id.*, at 55) was essentially what he said at oral argument before this Court: that the ordinance would not be enforceable against theatrical productions if the Constitution forbade it. Tr. of Oral Arg. 13. Surely that limitation does not cause the ordinance to be not generally applicable, in the relevant sense of being *targeted* against expressive conduct.[6]

---

[5] This followup explanation rendered what JUSTICE STEVENS calls counsel's "categorical" assertion that such productions would be exempt, see *post*, at 328, n. 12, notably *un*categorical. Rather than accept counsel's explanation—in the trial court and here—that is compatible with the text of the ordinance, JUSTICE STEVENS rushes to assign the ordinance a meaning that its words cannot bear, on the basis of counsel's initial footfault. That is not what constitutional adjudication ought to be.

[6] To correct JUSTICE STEVENS' characterization of my present point: I do not argue that Erie "carved out an exception" for Equus and Hair. *Post*, at 328, n. 14. Rather, it is my contention that the city attorney assured the trial court that the ordinance was susceptible of an interpretation that would carve out such exceptions to the extent the Constitution required them. Contrary to JUSTICE STEVENS' view, *ibid.*, I do not believe that a law directed against all public nudity ceases to be a "general law" (rather than one directed at expression) if it makes exceptions for nudity protected by decisions of this Court. To put it another way, I do not think a law contains the vice of being directed against expression if it bans all public nudity, except that public nudity which the Supreme Court has held cannot be banned because of its expressive content.

Moreover, even were I to conclude that the city of Erie had specifically singled out the activity of nude dancing, I still would not find that this regulation violated the First Amendment unless I could be persuaded (as on this record I cannot) that it was the communicative character of nude dancing that prompted the ban. When conduct other than speech itself is regulated, it is my view that the First Amendment is violated only "[w]here the government prohibits conduct precisely because of its communicative attributes." *Barnes*, 501 U. S., at 577 (emphasis deleted). Here, even if one hypothesizes that the city's object was to suppress only nude dancing, that would not establish an intent to suppress what (if anything) nude dancing communicates. I do not feel the need, as the Court does, to identify some "secondary effects" associated with nude dancing that the city could properly seek to eliminate. (I am highly skeptical, to tell the truth, that the addition of pasties and G-strings will at all reduce the tendency of establishments such as Kandyland to attract crime and prostitution, and hence to foster sexually transmitted disease.) The traditional power of government to foster good morals *(bonos mores)*, and the acceptability of the traditional judgment (if Erie wishes to endorse it) that nude public dancing *itself* is immoral, have not been repealed by the First Amendment.

JUSTICE SOUTER, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion and agree with the analytical approach that the plurality employs in deciding this case. Erie's stated interest in combating the secondary effects associated with nude dancing establishments is an interest unrelated to the suppression of expression under *United States* v. *O'Brien*, 391 U. S. 367 (1968), and the city's regulation is thus properly considered under the *O'Brien* standards. I do not believe, however, that the current record allows us to say that the city has made a suffi-

cient evidentiary showing to sustain its regulation, and I would therefore vacate the decision of the Pennsylvania Supreme Court and remand the case for further proceedings.

I

In several recent cases, we have confronted the need for factual justifications to satisfy intermediate scrutiny under the First Amendment. See, *e. g., Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377 (2000); *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180 (1997) *(Turner II); Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622 (1994) *(Turner I).* Those cases do not identify with any specificity a particular quantum of evidence, nor do I seek to do so in this brief concurrence.[1] What the cases do make plain, however, is that application of an intermediate scrutiny test to a government's asserted rationale for regulation of expressive activity demands some factual justification to connect that rationale with the regulation in issue.

---

[1] As explained below, *infra,* at 316, the issue of evidentiary justification was never joined, and with a multiplicity of factors affecting the analysis, a general formulation of the quantum required under *United States* v. *O'Brien,* 391 U. S. 367 (1968), will at best be difficult. A lesser showing may suffice when the means-end fit is evident to the untutored intuition. As we said in *Nixon,* "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." 528 U. S., at 391. (In *O'Brien,* for example, the secondary effects that the Government identified flowed from the destruction of draft cards, and there could be no doubt that a regulation prohibiting that destruction would alleviate the concomitant harm.) The nature of the legislating institution might also affect the calculus. We do not require Congress to create a record in the manner of an administrative agency, see *Turner II,* 520 U. S. 180, 213 (1997), and we accord its findings greater respect than those of agencies. See *id.,* at 195. We might likewise defer less to a city council than we would to Congress. The need for evidence may be especially acute when a regulation is content based on its face and is analyzed as content neutral only because of the secondary effects doctrine. And it may be greater when the regulation takes the form of a ban, rather than a time, place, or manner restriction.

In *Turner I*, for example, we stated that

> "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' *Quincy Cable TV, Inc.* v. *FCC*, 768 F. 2d 1434, 1455 (CADC 1985). It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.*, at 664 (plurality opinion).

The plurality concluded there, of course, that the record, though swollen by three years of hearings on the Cable Television Consumer Protection and Competition Act of 1992, was insufficient to permit the necessary determinations and remanded for a more thorough factual development. When the case came back to us, in *Turner II*, a majority of the Court reiterated those requirements, characterizing the enquiry into the acceptability of the Government's regulations as one that turned on whether they "were designed to address a real harm, and whether those provisions will alleviate it in a material way." 520 U. S., at 195. Most recently, in *Nixon*, we repeated that "[w]e have never accepted mere conjecture as adequate to carry a First Amendment burden," 528 U. S., at 392, and we examined the "evidence introduced into the record by petitioners or cited by the lower courts in this action . . . ," *id.*, at 393.

The focus on evidence appearing in the record is consistent with the approach earlier applied in *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976), and *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986). In *Young*, Detroit adopted a zoning ordinance requiring dispersal of adult theaters through the city and prohibiting them within 500 feet of a residential area. Urban planners and real estate experts attested to the harms created by clusters of such theaters, see 427 U. S., at 55, and we found that "[t]he record

discloses a factual basis" supporting the efficacy of Detroit's chosen remedy, *id.*, at 71. In *Renton*, the city similarly enacted a zoning ordinance requiring specified distances between adult theaters and residential zones, churches, parks, or schools. See 475 U. S., at 44. The city "held public hearings, reviewed the experiences of Seattle and other cities, and received a report from the City Attorney's Office advising as to developments in other cities." *Ibid.* We found that Renton's failure to conduct its own studies before enacting the ordinance was not fatal; "[t]he First Amendment does not require a city . . . to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.*, at 51–52.

The upshot of these cases is that intermediate scrutiny requires a regulating government to make some demonstration of an evidentiary basis for the harm it claims to flow from the expressive activity, and for the alleviation expected from the restriction imposed.[2] See, *e. g., Edenfield* v. *Fane*, 507 U. S. 761, 770–773 (1993) (striking down regulation of commercial speech for failure to show direct and material efficacy). That evidentiary basis may be borrowed from the records made by other governments if the experience elsewhere is germane to the measure under consideration and actually relied upon. I will assume, further, that the reliance may be shown by legislative invocation of a judicial opinion that accepted an evidentiary foundation as sufficient

---

[2] The plurality excuses Erie from this requirement with the simple observation that "it is evident" that the regulation will have the required efficacy. *Ante*, at 300. The *ipse dixit* is unconvincing. While I do agree that evidentiary demands need not ignore an obvious fit between means and ends, see n. 1, *supra*, it is not obvious that this is such a case. It is not apparent to me as a matter of common sense that establishments featuring dancers with pasties and G-strings will differ markedly in their effects on neighborhoods from those whose dancers are nude. If the plurality does find it apparent, we may have to agree to disagree.

for a similar regulation. What is clear is that the evidence of reliance must be a matter of demonstrated fact, not speculative supposition.

By these standards, the record before us today is deficient in its failure to reveal any evidence on which Erie may have relied, either for the seriousness of the threatened harm or for the efficacy of its chosen remedy. The plurality does the best it can with the materials to hand, see *ante*, at 297–298, but the pickings are slim. The plurality quotes the ordinance's preamble asserting that over the course of more than a century the city council had expressed "findings" of detrimental secondary effects flowing from lewd and immoral profitmaking activity in public places. But however accurate the recital may be and however honestly the councilors may have held those conclusions to be true over the years, the recitation does not get beyond conclusions on a subject usually fraught with some emotionalism. The plurality recognizes this, of course, but seeks to ratchet up the value of mere conclusions by analogizing them to the legislative facts within an administrative agency's special knowledge, on which action is adequately premised in the absence of evidentiary challenge. *Ante*, at 298. The analogy is not obvious; agencies are part of the executive branch and we defer to them in part to allow them the freedom necessary to reconcile competing policies. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–845 (1984). That aside, it is one thing to accord administrative leeway as to predictive judgments in applying " 'elusive concepts' " to circumstances where the record is inconclusive and "evidence . . . is difficult to compile," *FCC* v. *National Citizens Comm. for Broadcasting*, 436 U. S. 775, 796–797 (1978), and quite another to dispense with evidence of current fact as a predicate for banning a subcategory of expression.[3] As

---

[3] The proposition that the presence of nude dancing establishments increases the incidence of prostitution and violence is amenable to empirical treatment, and the city councilors who enacted Erie's ordinance are in a

to current fact, the city council's closest approach to an evidentiary record on secondary effects and their causes was the statement of one councilor, during the debate over the ordinance, who spoke of increases in sex crimes in a way that might be construed as a reference to secondary effects. See App. 44. But that reference came at the end of a litany of concerns ("free condoms in schools, drive-by shootings, abortions, suicide machines," and declining student achievement test scores) that do not seem to be secondary effects of nude dancing. *Ibid.* Nor does the invocation of *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991), in one paragraph of the preamble to Erie's ordinance suffice. App. to Pet. for Cert. 42a. The plurality opinion in *Barnes* made no mention of evidentiary showings at all, and though my separate opinion did make a pass at the issue, I did not demand reliance on germane evidentiary demonstrations, whether specific to the statute in question or developed elsewhere. To invoke *Barnes*, therefore, does not indicate that the issue of evidence has been addressed.

There is one point, however, on which an evidentiary record is not quite so hard to find, but it hurts, not helps, the city. The final *O'Brien* requirement is that the incidental speech restriction be shown to be no greater than essential to achieve the government's legitimate purpose. 391 U. S., at 377. To deal with this issue, we have to ask what basis there is to think that the city would be unsuccessful in countering any secondary effects by the significantly lesser restriction of zoning to control the location of nude dancing, thus allowing for efficient law enforcement, restricting effects on property values, and limiting exposure of the public.

position to look to the facts of their own community's experience as well as to experiences elsewhere. Their failure to do so is made all the clearer by one of the *amicus* briefs, largely devoted to the argument that scientifically sound studies show no such correlation. See Brief for First Amendment Lawyers Association as *Amicus Curiae* 16–23; *id.*, at App. 1–29.

The record shows that for 23 years there has been a zoning ordinance on the books to regulate the location of establishments like Kandyland, but the city has not enforced it. One councilor remarked that "I think there's one of the problems. The ordinances are on the books and not enforced.. Now this takes place. You really didn't need any other ordinances." App. 43. Another commented, "I felt very, very strongly, and I feel just as strongly right now, that this is a zoning matter." *Id.*, at 45. Even on the plurality's view of the evidentiary burden, this hurdle to the application of *O'Brien* requires an evidentiary response.

The record suggests that Erie simply did not try to create a record of the sort we have held necessary in other cases, and the suggestion is confirmed by the course of this litigation. The evidentiary question was never decided (or, apparently, argued) below, nor was the issue fairly joined before this Court. While respondent did claim that the evidence before the city council was insufficient to support the ordinance, see Brief for Respondent 44–49, Erie's reply urged us not to consider the question, apparently assuming that *Barnes* authorized us to disregard it. See Reply Brief for Petitioners 6–8. The question has not been addressed, and in that respect this case has come unmoored from the general standards of our First Amendment jurisprudence.[4]

Careful readers, and not just those on the Erie City Council, will of course realize that my partial dissent rests on a demand for an evidentiary basis that I failed to make when I concurred in *Barnes, supra.* I should have demanded the evidence then, too, and my mistake calls to mind Justice Jackson's foolproof explanation of a lapse of his own, when he quoted Samuel Johnson, " 'Ignorance, sir, ignorance.' " *McGrath* v. *Kristensen,* 340 U. S. 162, 178 (1950) (concurring

---

[4] By contrast, federal courts in other cases have frequently demanded evidentiary showings. See, *e. g., Phillips* v. *Keyport,* 107 F. 3d 164, 175 (CA3 1997) (en banc); *J&B Entertainment, Inc.* v. *Jackson,* 152 F. 3d 362, 370–371 (CA5 1998).

opinion).[5]  I may not be less ignorant of nude dancing than I was nine years ago, but after many subsequent occasions to think further about the needs of the First Amendment, I have come to believe that a government must toe the mark more carefully than I first insisted.  I hope it is enlightenment on my part, and acceptable even if a little late.  See *Henslee* v. *Union Planters Nat. Bank & Trust Co.*, 335 U. S. 595, 600 (1949) *(per curiam)* (Frankfurter, J., dissenting).

## II

The record before us now does not permit the conclusion that Erie's ordinance is reasonably designed to mitigate real harms.  This does not mean that the required showing cannot be made, only that, on this record, Erie has not made it. I would remand to give it the opportunity to do so.[6]   Accordingly, although I join with the plurality in adopting the *O'Brien* test, I respectfully dissent from the Court's disposition of the case.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

Far more important than the question whether nude dancing is entitled to the protection of the First Amendment are the dramatic changes in legal doctrine that the Court endorses today.  Until now, the "secondary effects" of commercial enterprises featuring indecent entertainment have justified only the regulation of their location.  For the first time, the Court has now held that such effects may justify

---

[5] See Boswell, Life of Samuel Johnson, in 44 Great Books of the Western World 82 (R. Hutchins & M. Adler eds. 1952).

[6] This suggestion does not, of course, bar the Pennsylvania Supreme Court from choosing simpler routes to disposition of the case if they exist. Respondent mounted a federal overbreadth challenge to the ordinance; it also asserted a violation of the Pennsylvania Constitution.  Either one of these arguments, if successful, would obviate the need for the factual development that is a prerequisite to *O'Brien* analysis.

the total suppression of protected speech. Indeed, the plurality opinion concludes that admittedly trivial advancements of a State's interests may provide the basis for censorship. The Court's commendable attempt to replace the fractured decision in *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991), with a single coherent rationale is strikingly unsuccessful; it is supported neither by precedent nor by persuasive reasoning.

I

As the preamble to Ordinance No. 75–1994 candidly acknowledges, the council of the city of Erie enacted the restriction at issue "for the purpose of limiting a recent increase in nude live entertainment within the City." *Ante*, at 290 (internal quotation marks omitted). Prior to the enactment of the ordinance, the dancers at Kandyland performed in the nude. As the Court recognizes, after its enactment they can perform precisely the same dances if they wear "pasties and G-strings." *Ante*, at 294; see also *ante*, at 313, n. 2 (SOUTER, J., concurring in part and dissenting in part). In both instances, the erotic messages conveyed by the dancers to a willing audience are a form of expression protected by the First Amendment. *Ante*, at 289.[1] Despite the similarity between the messages conveyed by the two forms of dance, they are not identical.

If we accept Chief Judge Posner's evaluation of this art form, see *Miller* v. *South Bend*, 904 F. 2d 1081, 1089–1104 (CA7 1990) (en banc), the difference between the two messages is significant. The plurality assumes, however, that the difference in the content of the message resulting from

---

[1] Respondent does not contend that there is a constitutional right to engage in conduct such as lap dancing. The message of eroticism conveyed by the nudity aspect of the dance is quite different from the issue of the proximity between dancer and audience. Respondent's contention is not that Erie has focused on lap dancers, see *ante*, at 308 (SCALIA, J., concurring in judgment), but that it has focused on the message conveyed by nude dancing.

the mandated costume change is *"de minimis."* *Ante,* at 294. Although I suspect that the patrons of Kandyland are more likely to share Chief Judge Posner's view than the plurality's, for present purposes I shall accept the assumption that the difference in the message is small. The crucial point to remember, however, is that whether one views the difference as large or small, nude dancing still receives First Amendment protection, even if that protection lies only in the "outer ambit" of that Amendment. *Ante,* at 289. Erie's ordinance, therefore, burdens a message protected by the First Amendment. If one assumes that the same erotic message is conveyed by nude dancers as by those wearing miniscule costumes, one means of expressing that message is banned;[2] if one assumes that the messages are different, one of those messages is banned. In either event, the ordinance is a total ban.

The plurality relies on the so-called "secondary effects" test to defend the ordinance. *Ante,* at 290–296. The present use of that rationale, however, finds no support whatsoever in our precedents. Never before have we approved the use of that doctrine to justify a total ban on protected First Amendment expression. On the contrary, we have been quite clear that the doctrine would not support that end.

In *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976), we upheld a Detroit zoning ordinance that placed special restrictions on the location of motion picture theaters that exhibited "adult" movies. The "secondary effects" of the adult theaters on the neighborhoods where they were located—lower property values and increases in crime (especially prostitution) to name a few—justified the burden im-

---

[2] Although nude dancing might be described as one protected "means" of conveying an erotic message, it does not follow that a protected message has not been totally banned simply because there are other, similar ways to convey erotic messages. See *ante,* at 292–293. A State's prohibition of a particular book, for example, does not fail to be a total ban simply because other books conveying a similar message are available.

posed by the ordinance. *Id.*, at 54, 71, and n. 34 (plurality opinion). Essential to our holding, however, was the fact that the ordinance was "nothing more than a limitation on the place where adult films may be exhibited" and did not limit the size of the market in such speech. *Id.*, at 71; see also *id.*, at 61, 63, n. 18, 70, 71, n. 35. As Justice Powell emphasized in his concurrence:

> "At most the impact of the ordinance on [the First Amendment] interests is incidental and minimal. Detroit has silenced no message, has invoked no censorship, and has imposed no limitation upon those who wish to view them. The ordinance is addressed only to the places at which this type of expression may be presented, a restriction that does not interfere with content. Nor is there any significant overall curtailment of adult movie presentations, or the opportunity for a message to reach an audience." *Id.*, at 78–79.

See also *id.*, at 81, n. 4 ("[A] zoning ordinance that merely specifies where a theater may locate, and that does not reduce significantly the number or accessibility of theaters presenting particular films, stifles no expression").

In *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986), we upheld a similar ordinance, again finding that the "secondary effects of such theaters on the surrounding community" justified a restrictive zoning law. *Id.*, at 47 (emphasis deleted). We noted, however, that "[t]he Renton ordinance, like the one in *American Mini Theatres*, does not ban adult theaters altogether," but merely "circumscribe[s] their choice as to location." *Id.*, at 46, 48; see also *id.*, at 54 ("In our view, the First Amendment requires . . . that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city . . ."). Indeed, in both *Renton* and *American Mini Theatres*, the zoning ordinances were analyzed as mere "time,

place, and manner" regulations.[3]   See *Renton*, 475 U. S., at
46; *American Mini Theatres*, 427 U. S., at 63, and n. 18; *id.*,
at 82, n. 6.   Because time, place, and manner regulations
must "leave open ample alternative channels for communica-
tion of the information," *Ward* v. *Rock Against Racism*, 491
U. S. 781, 791 (1989), a total ban would necessarily fail that
test.[4]

And we so held in *Schad* v. *Mount Ephraim*, 452 U. S. 61
(1981).   There, we addressed a zoning ordinance that did not
merely require the dispersal of adult theaters, but prohibited

---

[3] The plurality contends, *ante*, at 295, that *Ward* v. *Rock Against Rac-
ism*, 491 U. S. 781 (1989), shows that we have used the secondary effects
rationale to justify more burdensome restrictions than those approved in
*Renton* and *American Mini Theatres*.   That argument is unpersuasive
for two reasons.   First, as in the two cases just mentioned, the regulation
in *Ward* was as a time, place, and manner restriction.   See 491 U. S., at
791; *id.*, at 804 (Marshall, J., dissenting).   Second, as discussed below,
*Ward* is not a secondary effects case.   See *infra*, at 325–326.

[4] We also held in *Renton* that in enacting its adult theater zoning or-
dinance, the city of Renton was permitted to rely on a detailed study
conducted by the city of Seattle that examined the relationship between
zoning controls and the secondary effects of adult theaters.   (It was per-
mitted to rely as well on "the 'detailed findings' summarized" in an opinion
of the Washington Supreme Court to the same effect.)   475 U. S., at 51–52.
Renton, having identified the same problem in its own city as that experi-
enced in Seattle, quite logically drew on Seattle's experience and adopted
a similar solution.   But if Erie is relying on the Seattle study as well (as
the plurality suggests, *ante*, at 296–297), its use of that study is most
peculiar.   After identifying a problem in its own city similar to that in
Seattle, Erie has implemented a solution (pasties and G-strings) bearing
no relationship to the efficacious remedy identified by the Seattle study
(dispersal through zoning).

But the city of Erie, of course, has not in fact pointed to any study
by anyone suggesting that the adverse secondary effects of commercial
enterprises featuring erotic dancing depends in the slightest on the precise
costume worn by the performers—it merely assumes it to be so.   See
*infra*, at 323–324.   If the city is permitted simply to assume that a slight
addition to the dancers' costumes will sufficiently decrease secondary ef-
fects, then presumably the city can require more and more clothing as
long as any danger of adverse effects remains.

them altogether. In striking down that law, we focused precisely on that distinction, holding that the secondary effects analysis endorsed in the past did not apply to an ordinance that totally banned nude dancing: "The restriction [in *Young* v. *American Mini Theatres*] did not affect the number of adult movie theaters that could operate in the city; it merely dispersed them. The Court did not imply that a municipality could ban all adult theaters—much less all live entertainment or all nude dancing—from its commercial districts citywide." *Id.,* at 71 (plurality opinion); see also *id.,* at 76; *id.,* at 77 (Blackmun, J., concurring) (joining plurality); *id.,* at 79 (Powell, J., concurring) (same).

The reason we have limited our secondary effects cases to zoning and declined to extend their reasoning to total bans is clear and straightforward: A dispersal that simply limits the places where speech may occur is a minimal imposition, whereas a total ban is the most exacting of restrictions. The State's interest in fighting presumed secondary effects is sufficiently strong to justify the former, but far too weak to support the latter, more severe burden.[5] Yet it is perfectly clear that in the present case—to use Justice Powell's metaphor in *American Mini Theatres*—the city of Erie has totally silenced a message the dancers at Kandyland want to convey. The fact that this censorship may have a laudable ulterior purpose cannot mean that censorship is not censorship. For these reasons, the Court's holding rejects the explicit reasoning in *American Mini Theatres* and *Renton* and the express holding in *Schad.*

The Court's use of the secondary effects rationale to permit a total ban has grave implications for basic free speech principles. Ordinarily, laws regulating the primary effects of speech, *i. e.,* the intended persuasive effects caused by the

---

[5] As the plurality recognizes by quoting my opinion in *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 70 (1976), see *ante,* at 294, "the First Amendment will not tolerate the total suppression of erotic materials that have some artistic value," though it will permit zoning regulations.

speech, are presumptively invalid. Under today's opinion, a State may totally ban speech based on its secondary effects—which are defined as those effects that "happen to be associated" with speech, *Boos* v. *Barry*, 485 U. S. 312, 320–321 (1988); see *ante*, at 291—yet the regulation is not presumptively invalid. Because the category of effects that "happen to be associated" with speech includes the narrower subset of effects caused by speech, today's holding has the effect of swallowing whole a most fundamental principle of First Amendment jurisprudence.

## II

The plurality's mishandling of our secondary effects cases is not limited to its approval of a total ban. It compounds that error by dramatically reducing the degree to which the State's interest must be furthered by the restriction imposed on speech, and by ignoring the critical difference between secondary effects caused by speech and the incidental effects on speech that may be caused by a regulation of conduct.

In what can most delicately be characterized as an enormous understatement, the plurality concedes that "requiring dancers to wear pasties and G-strings may not greatly reduce these secondary effects." *Ante*, at 301. To believe that the mandatory addition of pasties and a G-string will have *any* kind of noticeable impact on secondary effects requires nothing short of a titanic surrender to the implausible. It would be more accurate to acknowledge, as JUSTICE SCALIA does, that there is no reason to believe that such a requirement "will at all reduce the tendency of establishments such as Kandyland to attract crime and prostitution, and hence to foster sexually transmitted disease." *Ante*, at 310 (opinion concurring in judgment); see also *ante*, at 313, n. 2 (SOUTER, J., concurring in part and dissenting in part). Nevertheless, the plurality concludes that the "less stringent" test announced in *United States* v. *O'Brien*, 391 U. S. 367 (1968), "requires only that the regulation further the interest in

combating such effects," *ante*, at 301; see also *ante*, at 289. It is one thing to say, however, that *O'Brien* is more lenient than the "more demanding standard" we have imposed in cases such as *Texas* v. *Johnson*, 491 U. S. 397 (1989). See *ante*, at 289. It is quite another to say that the test can be satisfied by nothing more than the mere possibility of *de minimis* effects on the neighborhood.

The plurality is also mistaken in equating our secondary effects cases with the "incidental burdens" doctrine applied in cases such as *O'Brien;* and it aggravates the error by invoking the latter line of cases to support its assertion that Erie's ordinance is unrelated to speech. The incidental burdens doctrine applies when "'speech' and 'nonspeech' elements are combined in the same course of conduct," and the government's interest in regulating the latter justifies incidental burdens on the former. *O'Brien*, 391 U. S., at 376. Secondary effects, on the other hand, are indirect consequences of protected speech and may justify regulation of the places where that speech may occur. See *American Mini Theatres*, 427 U. S., at 71, n. 34 ("[A] concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime").[6] When a State enacts a regulation, it might focus on the secondary effects of speech as its aim, or it might concentrate on nonspeech related concerns, having no thoughts at all with respect to how its regulation will affect speech—and only later, when the regulation is found to burden speech, justify the imposition as an unintended incidental consequence.[7] But those interests are not the

---

[6] A secondary effect on the neighborhood that "happen[s] to be associated with" a form of speech is, of course, critically different from "the direct impact of speech on its audience." *Boos* v. *Barry*, 485 U. S. 312, 320–321 (1988). The primary effect of speech is the persuasive effect of the message itself.

[7] In fact, the very notion of focusing in on incidental burdens at the time of enactment appears to be a contradiction in terms. And if it were not the case that there is a difference between laws aimed at secondary effects and general bans incidentally burdening speech, then one wonders why

same, and the plurality cannot ignore their differences and insist that both aims are equally unrelated to speech simply because Erie might have "recogniz[ed]" that it could possibly have had either aim in mind. See *ante*, at 295.[8] One can think of an apple and an orange at the same time; that does not turn them into the same fruit.

Of course, the line between governmental interests aimed at conduct and unrelated to speech, on the one hand, and interests arising out of the effects of the speech, on the other, may be somewhat imprecise in some cases. In this case, however, we need not wrestle with any such difficulty because Erie has expressly justified its ordinance with reference to secondary effects. Indeed, if Erie's concern with the effects of the message were unrelated to the message itself, it is strange that the only means used to combat those effects is the suppression of the message.[9] For these reasons, the plurality's argument that "this case is similar to *O'Brien*," *ante*, at 291; see also *ante*, at 294, is quite wrong, as are its

---

JUSTICES SCALIA and SOUTER adopted such strikingly different approaches in *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991).

[8] I frankly do not understand the plurality's declaration that a State's interest in the secondary effects of speech that are "associated" with the speech are not "related" to the speech. *Ante*, at 296. See, *e. g.*, Webster's Third New International Dictionary 132 (1966) (defining "associate" as "closely related"). Sometimes, though, the plurality says that the secondary effects are "caused" by the speech, rather than merely "associated with" the speech. See, *e. g.*, *ante*, at 291, 293, 297, 300. If that is the definition of secondary effects the plurality adopts, then it is even more obvious that an interest in secondary effects is related to the speech at issue. See *Barnes*, 501 U. S., at 585–586 (SOUTER, J., concurring in judgment) (secondary effects are not related to speech because their connection to speech is only one of correlation, not causation).

[9] As Justice Powell said in his concurrence in *Young* v. *American Mini Theatres*, 427 U. S., at 82, n. 4: "[H]ad [Detroit] been concerned with restricting the message purveyed by adult theaters, it would have tried to close them or restrict their number rather than circumscribe their choice as to location." Quite plainly, Erie's total ban evinces its concern with the message being regulated.

citations to *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984), and *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), *ante*, at 293–295, neither of which involved secondary effects. The plurality cannot have its cake and eat it too—either Erie's ordinance was not aimed at speech and the plurality may attempt to justify the regulation under the incidental burdens test, or Erie has aimed its law at the secondary effects of speech, and the plurality can try to justify the law under that doctrine. But it cannot conflate the two with the expectation that Erie's interests aimed at secondary effects will be rendered unrelated to speech by virtue of this doctrinal polyglot.

Correct analysis of the issue in this case should begin with the proposition that nude dancing is a species of expressive conduct that is protected by the First Amendment. As Chief Judge Posner has observed, nude dancing fits well within a broad, cultural tradition recognized as expressive in nature and entitled to First Amendment protection. See 904 F. 2d, at 1089–1104; see also Note, 97 Colum. L. Rev. 1844 (1997). The nudity of the dancer is both a component of the protected expression and the specific target of the ordinance. It is pure sophistry to reason from the premise that the regulation of the nudity component of nude dancing is unrelated to the message conveyed by nude dancers. Indeed, both the text of the ordinance and the reasoning in the plurality's opinion make it pellucidly clear that the city of Erie has prohibited nude dancing *"precisely because of its communicative attributes."* *Barnes*, 501 U. S., at 577 (SCALIA, J., concurring in judgment) (emphasis in original); see *id.*, at 596 (White, J., dissenting).

### III

The censorial purpose of Erie's ordinance precludes reliance on the judgment in *Barnes* as sufficient support for the Court's holding today. Several differences between the Erie ordinance and the statute at issue in *Barnes* belie the plurality's assertion that the two laws are "almost identical."

*Ante*, at 289. To begin with, the preamble to Erie's ordinance candidly articulates its agenda, declaring:

> "Council specifically wishes to adopt the concept of Public Indecency prohibited by the laws of the State of Indiana, which was approved by the U. S. Supreme Court in *Barnes vs. Glen Theatre Inc.*, . . . *for the purpose of limiting a recent increase in nude live entertainment within the City.*" App. to Pet. for Cert. 42a (emphasis added); see also *ante*, at 290.[10]

As its preamble forthrightly admits, the ordinance's "purpose" is to "limi[t]" a protected form of speech; its invocation of *Barnes* cannot obliterate that professed aim.[11]

Erie's ordinance differs from the statute in *Barnes* in another respect. In *Barnes*, the Court expressly observed that the Indiana statute had not been given a limiting construction by the Indiana Supreme Court. As presented to this Court, there was nothing about the law itself that would confine its application to nude dancing in adult entertainment establishments. See 501 U. S., at 564, n. 1 (discussing Indiana Supreme Court's lack of a limiting construction); see also *id.*, at 585, n. 2 (SOUTER, J., concurring in judgment).

---

[10] The preamble also states: "[T]he Council of the City of Erie has [found] . . . that certain lewd, immoral activities carried on in public places for profit . . . lead to the debasement of both women and men . . . ." App. to Pet. for Cert. 41a.

[11] Relying on five words quoted from the Supreme Court of Pennsylvania, the plurality suggests that I have misinterpreted that court's reading of the preamble. *Ante*, at 290. What follows, however, is a more complete statement of what that court said on this point:

"We acknowledge that one of the purposes of the Ordinance is to combat negative secondary effects. That, however, is not its only goal. Inextricably bound up with this stated purpose is an unmentioned purpose that directly impacts on the freedom of expression: that purpose is to impact negatively on the erotic message of the dance. . . . We believe . . . that the stated purpose for promulgating the Ordinance is inextricably linked with the content-based motivation to suppress the expressive nature of nude dancing." 553 Pa. 348, 359, 719 A. 2d 273, 279 (1998).

Erie's ordinance, however, comes to us in a much different posture. In an earlier proceeding in this case, the Court of Common Pleas asked Erie's counsel "what effect would this ordinance have on theater . . . productions such as Equus, Hair, O[h!] Calcutta[!]? Under your ordinance would these things be prevented . . . ?" Counsel responded: "No, they wouldn't, Your Honor." App. 53.[12] Indeed, as *stipulated* in the record, the city permitted a production of Equus to proceed without prosecution, even after the ordinance was in effect, and despite its awareness of the nudity involved in the production. *Id.*, at 84.[13] Even if, in light of its broad applicability, the statute in *Barnes* was not aimed at a particular form of speech, Erie's ordinance is quite different. As presented to us, the ordinance is deliberately targeted at Kandyland's type of nude dancing (to the exclusion of plays like Equus), in terms of both its applicable scope and the city's enforcement.[14]

---

[12] In my view, Erie's categorical response forecloses JUSTICE SCALIA's assertion that the city's position on Equus and Hair was limited to "[o]ne instance," where "the city was [not] aware of the nudity," and "no one had complained." *Ante*, at 308 (opinion concurring in judgment). Nor could it be contended that selective applicability by stipulated enforcement should be treated differently from selective applicability by statutory text. See *Barnes*, 501 U. S., at 574 (SCALIA, J., concurring in judgment) (selective enforcement may affect a law's generality). Were it otherwise, constitutional prohibitions could be circumvented with impunity.

[13] The stipulation read: "The play, 'Equus' featured frontal nudity and was performed for several weeks in October/November 1994 at the Roadhouse Theater in downtown Erie with no efforts to enforce the nudity prohibition which became effective during the run of the play."

[14] JUSTICE SCALIA argues that Erie might have carved out an exception for Equus and Hair because it guessed that this Court would consider them protected forms of expression, see *Southeastern Promotions, Ltd. v. Conrad*, 420 U. S. 546, 550, 557–558 (1975) (holding that Hair, including the "group nudity and simulated sex" involved in the production, is protected speech); in his view, that makes the distinction unobjectionable and renders the ordinance no less of a general law. *Ante*, at 309 (opinion concurring in judgment). This argument appears to contradict his earlier definition of a general law: "A law is 'general' . . . if it regulates conduct

This narrow aim is confirmed by the expressed views of the Erie City Councilmembers who voted for the ordinance. The four city councilmembers who approved the measure (of the six total councilmembers) each stated his or her view that the ordinance was aimed specifically at nude adult entertainment, and not at more mainstream forms of entertainment that include total nudity, nor even at nudity in general. One lawmaker observed: "We're not talking about nudity. We're not talking about the theater or art . . . . We're talking about what is indecent and immoral. . . . We're not prohibiting nudity, we're prohibiting nudity when it's used in a lewd and immoral fashion." App. 39. Though not quite as succinct, the other councilmembers expressed similar convictions. For example, one member illustrated his understanding of the aim of the law by contrasting it with his recollection about high school students swimming in the nude in the school's pool. The ordinance was not intended to cover those incidents of nudity: "But what I'm getting at is [the swimming] wasn't indecent, it wasn't an immoral thing, and

without regard to whether that conduct is expressive." *Barnes* v. *Glen Theatre, Inc.*, 501 U. S., at 576, n. 3 (opinion concurring in judgment). If the ordinance regulates conduct (public nudity), it does not do so without regard to whether the nudity is expressive if it exempts the public nudity in Hair *precisely* "because of its expressive content." *Ante*, at 309, n. 6 (opinion concurring in judgment). Moreover, if Erie exempts Hair because it wants to avoid a conflict with the First Amendment (rather than simply to exempt instances of nudity it finds inoffensive), that rationale still does not explain why Hair is exempted but Kandyland is not, since *Barnes* held that both are constitutionally protected.

Justice Scalia also states that even if the ordinance singled out nude dancing, he would not strike down the law unless the dancing was singled out because of its message. *Ante*, at 310. He opines that here, the basis for singling out Kandyland is morality. *Ibid.* But since the "morality" of the public nudity in Hair is left untouched by the ordinance, while the "immorality" of the public nudity in Kandyland is singled out, the distinction cannot be that "nude public dancing *itself* is immoral." *Ibid.* (emphasis in original). Rather, the only arguable difference between the two is that one's message is more immoral than the other's.

yet there was nudity." *Id.*, at 42. The same lawmaker then disfavorably compared the nude swimming incident to the activities that occur in "some of these clubs" that exist in Erie—clubs that would be covered by the law. *Ibid.*[15] Though such comments could be consistent with an interest in a general prohibition of nudity, the complete absence of commentary on that broader interest, and the councilmembers' exclusive focus on adult entertainment, is evidence of the ordinance's aim. In my view, we need not strain to find consistency with more general purposes when the most natural reading of the record reflects a near obsessive preoccupation with a single target of the law.[16]

The text of Erie's ordinance is also significantly different from the law upheld in *Barnes*. In *Barnes*, the statute defined "nudity" as "the showing of the human male or female

---

[15] Other members said their focus was on "bottle clubs," and the like, App. 43, and attempted to downplay the effect of the ordinance by acknowledging that "the girls can wear thongs or a G-string and little pasties that are smaller than a diamond." *Ibid.* Echoing that focus, another member stated that "[t]here still will be adult entertainment in this town, only it will be in a little different form." *Id.*, at 47.

[16] The plurality dismisses this evidence, declaring that it "will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive." *Ante*, at 292 (citing *United States* v. *O'Brien*, 391 U. S. 367, 382–383 (1968); *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 47–48 (1986)). First, it is worth pointing out that this doctrinaire formulation of *O'Brien's* cautionary statement is overbroad. See generally L. Tribe, American Constitutional Law § 12–5, pp. 819–820 (2d ed. 1988). Moreover, *O'Brien* itself said only that we would not strike down a law "on the *assumption* that a wrongful purpose or motive has caused the power to be exerted," 391 U. S., at 383 (emphasis added; internal quotation marks omitted), and that statement was due to our recognition that it is a "hazardous matter" to determine the actual intent of a body as large as Congress "on the basis of what fewer than a handful of Congressmen said about [a law]," *id.*, at 384. Yet neither consideration is present here. We need not base our inquiry on an "assumption," nor must we infer the collective intent of a large body based on the statements of a few, for we have in the record the actual statements of all the city councilmembers who voted in favor of the ordinance.

genitals" (and certain other regions of the body) "with less than a fully opaque covering." 501 U. S., at 569, n. 2. The Erie ordinance duplicates that definition in all material respects, but adds the following to its definition of "[n]udity":

> "'[T]he exposure of any device, costume, or covering *which gives the appearance of or simulates* the genitals, pubic hair, natal cleft, perineum anal region or pubic hair region; or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, *which device simulates and gives the realistic appearance* of nipples and/or areola.'" *Ante*, at 283–284, n. (emphasis added).

Can it be doubted that this out-of-the-ordinary definition of "nudity" is aimed directly at the dancers in establishments such as Kandyland? Who else is likely to don such garments?[17] We should not stretch to embrace fanciful explanations when the most natural reading of the ordinance unmistakably identifies its intended target.

It is clear beyond a shadow of a doubt that the Erie ordinance was a response to a more specific concern than nudity in general, namely, nude dancing of the sort found in Kandyland.[18] Given that the Court has not even tried to defend

---

[17] Is it seriously contended (as would be necessary to sustain the ordinance as a general prohibition) that, when crafting this bizarre definition of "nudity," Erie's concern was with the use of simulated nipple covers on "nude beaches and [by otherwise] unclothed purveyors of hot dogs and machine tools"? *Barnes*, 501 U. S., at 574 (SCALIA, J., concurring in judgment); see also *ante*, at 308 (SCALIA, J., concurring in judgment). It is true that one might *conceivably* imagine that is Erie's aim. But it is far more likely that this novel definition was written with the Kandyland dancers and the like in mind, since they are the only ones covered by the law (recall that plays like Equus are exempted from coverage) who are likely to utilize such unconventional clothing.

[18] The plurality states that Erie's ordinance merely "replaces and updates provisions of an 'Indecency and Immorality' ordinance" from the mid-19th century, just as the statute in *Barnes* did. *Ante*, at 290. First of all, it is not clear that this is correct. The record does indicate that

the ordinance's total ban on the ground that its censorship of protected speech might be justified by an overriding state interest, it should conclude that the ordinance is patently invalid. For these reasons, as well as the reasons set forth in Justice White's dissent in *Barnes*, I respectfully dissent.

---

Erie's Ordinance No. 75–1994 updates an older ordinance of similar import. Unfortunately, that old regulation is not in the record. Consequently, whether the new ordinance merely "replaces" the old one is a matter of debate. From statements of one councilmember, it can reasonably be inferred that the old ordinance was merely a residential zoning restriction, not a total ban. See App. 43. If that is so, it leads to the further question why Erie felt it necessary to shift to a total ban in 1994.

But even if the plurality's factual contention is correct, it does not undermine the points I have made in the text. In *Barnes*, the point of noting the ancient pedigree of the Indiana statute was to demonstrate that its passage antedated the appearance of adult entertainment venues, and therefore could not have been motivated by the presence of those establishments. The inference supposedly rebutted in *Barnes* stemmed from the *timing* of the enactment. Here, however, the inferences I draw depend on the text of the ordinance, its preamble, its scope and enforcement, and the comments of the councilmembers. These do not depend on the timing of the ordinance's enactment.