481 F.3d 163
 WHITE RIVER AMUSEMENT PUB, INC., Plaintiff-Appellee,
v.
TOWN OF HARTFORD, The Selectboard Of Hartford, Vermont, Hunter Rieseberg, as the Town Manager of Hartford, Vermont, Todd Steadman, as Chairman, Selectboard of the Town of Hartford, Vermont, Leonard Berliner, as member of the Selectboard, Town of Hartford, Vermont, Gayle Ottman, as member of the Selectboard, Town of Hartford, Vermont, Ray Cerasoli, as member of the Selectboard, Town of Hartford, Vermont, Richard Ballou, as member of the Selectboard, Town of Hartford, Vermont, and Joseph Estey, as Chief of Police of Hartford, Vermont, Defendants-Appellants.
Docket No. 06-0233-cv.
 United States Court of Appeals, Second Circuit.
 Argued: September 20, 2006.
 Decided: March 28, 2007.
 
 Kevin J. Coyle (William F. Ellis, on the brief), McNeil, Leddy & Sheahan, Burlington, VT, for Defendants-Appellants.
 H. Glenn Alberich, Burns & Levinson LLP, Boston, MA (David Putter, Montpelier, VT, on the brief), for Plaintiff-Appellee.
 Before CALABRESI, POOLER, and B.D. PARKER, Circuit Judges.
 POOLER, Circuit Judge.
 
 
 1
 Defendants-appellants Town of Hartford, Vermont (the "Town"), and Town officials Hunter Rieseberg, Todd Steadman, Leonard Berliner, Gayle Ottman, Ray Cerasoli, Richard Ballou, and Joseph Estey, appeal from the December 15, 2005, judgment of the District Court for the District of Vermont (J. Garvan Murtha, J.), granting declaratory and injunctive relief to plaintiff-appellee White River Amusement Pub, Inc. (the "Corporation"). In a ruling on cross-motions for summary judgment, the district court also disposed of the Corporation's remaining claims, including all claims for damages. See White River Amusement Pub, Inc. v. Town of Hartford, 412 F.Supp.2d 416 (D.Vt.2005). Plaintiff has not cross-appealed. For the reasons set forth below, the judgment of the district court is affirmed.
 
 BACKGROUND
 
 2
 In September 2001, the Corporation opened the White River Amusement Pub (the "WRAP"), an adult entertainment business, in downtown White River Junction within the Town of Hartford. The WRAP offered nude and semi-nude female dancing, as well as food and beverages. At the time the WRAP commenced operations, the Town had no ordinance prohibiting public nudity or nude dancing.
 
 
 3
 In the spring of 2002, at the request of the Town Selectboard, the Town's attorney, Robert Manby, drafted a proposed public indecency ordinance (the "Ordinance"). Manby also noted, in a letter to the Selectboard, that in SBC Enterprises, Inc. v. City of South Burlington, 892 F.Supp. 578 (D.Vt.1995), a district court had upheld a similar ordinance enacted by the city of South Burlington, based on the fact that the South Burlington City Council had passed a resolution indicating that it had considered the "secondary effects" of nude dancing when enacting the ordinance. Manby therefore advised the Selectboard to adopt a similar resolution when enacting the Ordinance.
 
 
 4
 The Selectboard considered the Ordinance during two meetings in April and May 2002. On April 30, 2002, the Selectboard conducted a first reading of the proposed Ordinance. The Town Manager, Hunter Rieseberg, gave an overview of the Ordinance, summarizing its provisions. The Selectboard then voted unanimously to approve the Ordinance and forward it to a public hearing. The Ordinance was next considered on May 28, 2002. Rieseberg and Todd Steadman, Chairman of the Selectboard, introduced the Ordinance. Steadman highlighted the definitions of certain terms in the Ordinance and noted that this type of ordinance had been tested in the courts. Members of the public asked a few questions, and after ten minutes, the public hearing was adjourned. Without any further discussion of the merits of the Ordinance, the Board voted in favor of its adoption.
 
 
 5
 The Ordinance prohibits an individual from doing the following in a public place: engaging in sexual intercourse; appearing in a state of nudity; fondling his or her genitals; fondling the genitals of another person; fondling his or her breasts; or fondling the breasts of another person. "Nudity" is defined as "the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering . . ., or the showing of the female breast with less than a fully opaque covering . . . of any portion of the nipple or the depiction of covered male genitals in a discernibly turgid state." A woman breastfeeding her child is specifically excepted from this definition of nudity. A "public place" is defined as "any location frequented by the public," including "business and commercial establishments, . . . night clubs, . . . [and] cabarets."
 
 
 6
 In enacting the Ordinance, the Selectboard did not follow Manby's recommendation to adopt a resolution discussing secondary effects. In addition, the Selectboard did not conduct any independent analysis of the actual or potential secondary effects of public nudity in the local area. Town representatives or members of the Selectboard did, however, review at most three sample public indecency ordinances from other Vermont municipalities. While the Ordinance was under consideration, one or two members of the Selectboard also discussed with their constituents the potential negative secondary effects associated with adult businesses. Steadman has since explained that although he was not aware of any adverse secondary effects actually caused by the WRAP, he put the Ordinance on the agenda because of his desire to protect economic development opportunities within the Town, and because he was concerned about the potential for the creation of negative secondary effects in areas where public nudity was occurring.
 
 
 7
 After the Selectboard enacted the Ordinance, the Town's Department of Planning and Development Services obtained studies analyzing the negative secondary effects of adult businesses. These materials were discussed during a special town meeting on September 9, 2002, at which certain Town officials also articulated their rationale for enacting the Ordinance, i.e., to combat the negative secondary effects of public nudity. The following day, the Town electorate voted against the following ballot question: "whether the voters of the Town of Hartford disapprove the `Public Indecency Ordinance' adopted by the Selectboard on May 28, 2002." The Ordinance therefore remained in effect.
 
 
 8
 On November 22, 2002, the Corporation brought this action, alleging that the Ordinance violated its federal and state constitutional rights. The parties cross-moved for summary judgment, but while these motions were pending, on February 13, 2005, a fire severely damaged the building in which the WRAP was housed. Shortly thereafter, defendants filed an additional motion for summary judgment, arguing that the Corporation's claims had been mooted by the destruction of the WRAP's premises. In response to this motion, the Corporation's President, Daniel Garr, submitted an affidavit explaining the Corporation's "plan and intent" to continue providing adult entertainment in the Town. Garr explained that the Corporation had a lease on the WRAP's premises that ran through July 15, 2006, with an additional five year option and a first option to purchase the premises. He noted that the Corporation did not intend to terminate its lease, and that it was also assessing other locations in Hartford with a view to reopening temporarily at an alternate site.
 
 
 9
 In a December 15, 2005, opinion, the district court concluded that the Corporation's claims were not moot. The court found that there was a "reasonable expectation that upon the WRAP's re-opening, the Town would enforce the Ordinance, subjecting [the Corporation] to the same substantial harm." White River, 412 F.Supp.2d at 421. With respect to the First Amendment freedom of expression claims, the court applied the O'Brien standard for expressive conduct, see United States v. O'Brien, 391 U.S. 367, 376-77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and found that the Ordinance satisfied the first, third, and fourth O'Brien factors. White River, 412 F.Supp.2d at 422. However, the district court concluded that the Ordinance did not satisfy the second O'Brien factor, because the Town failed to demonstrate that, "at the time it enacted the Ordinance, it relied upon at least some evidence reasonably believed to be relevant to its interest in preventing negative secondary effects associated with nude adult entertainment, and that the evidence fairly supported its rationale for the Ordinance." Id. at 426. The court therefore concluded that the Ordinance was unconstitutional under both the federal and Vermont constitutions. Id. at 428, 429.[1] The court then rejected the Corporation's remaining claims. Id. at 428-29. In addition, the court granted summary judgment to the individual defendants with respect to plaintiff's damages claims, finding that the legislative defendants (i.e., the members of the Selectboard) were entitled to legislative immunity and that the remaining individual defendants, who had not been personally involved in the enactment of the Ordinance, had not engaged in any constitutional deprivation of the Corporation's rights. Id. at 430.
 
 DISCUSSION
 
 10
 We review de novo a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party. Scholastic, Inc. v. Harris, 259 F.3d 73, 81 (2d Cir.2001).
 
 
 11
 On appeal, defendants make two arguments. First, they contend that the destruction of the WRAP's premises moots plaintiff's claims. Second, defendants claim that the Ordinance does not violate either the First Amendment or Article 13 of the Vermont Constitution because the Town acted out of concern for the negative secondary effects of public nudity.
 
 
 12
 I. Mootness.
 
 
 13
 Mootness is a question of law that we review de novo. Catanzano v. Wing, 277 F.3d 99, 107 (2d Cir.2001). Mootness imposes a "case-or-controversy requirement" that "subsists through all stages of federal judicial proceedings . . . . [T]hroughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Spencer v. Kemna, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (internal citations and quotation marks omitted). A "case is moot when the issues presented are no longer `live' or the parties lack a legally cognizable interest in the outcome." City of Erie v. Pap's A.M., 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (internal quotation marks omitted). If "there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to [the] prevailing party." Id. (internal citations and quotation marks omitted, alteration in original).
 
 
 14
 In this case, there is a reasonable expectation that the threatened injury will occur in the future. Although the WRAP's premises were destroyed by a fire, the Corporation has expressed a clear intent to reopen the WRAP and to "continue to provide the same dance entertainment," namely, "exotic, expressive entertainment, performed by females, sometimes clothed, sometimes topless and sometimes completely nude." The Corporation has a renewable lease on the premises, which it does not intend to terminate. As soon as the WRAP reopens, the Town will likely enforce the Ordinance, and the WRAP will therefore once again face substantial harm. See Begins v. Philbrook, 513 F.2d 19, 23 (2d Cir.1975) ("[T]he Regulation still stands and defendant clearly intends to enforce it against plaintiffs should the occasion demand."); see also Pap's A.M., 529 U.S. at 287, 120 S.Ct. 1382 ("[Plaintiff] is still incorporated under Pennsylvania law, and it could again decide to operate a nude dancing establishment in Erie."); cf. S. Or. Barter Fair v. Jackson County, 372 F.3d 1128, 1134 (9th Cir.2004) (concluding that although plaintiff had not held a major event in seven years, case would be moot only if plaintiff had entirely ceased to operate, left the business, and no longer sought or intended to seek a permit). Because the very act of reopening the WRAP will subject the Corporation to immediate legal jeopardy, the prospect of future harm is not merely a "speculative contingency." Cf. Bd. of License Comm'rs of Tiverton v. Pastore, 469 U.S. 238, 239-40, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985) (per curiam) (prospect of legal challenge being immediately revived by the reopening of the plaintiff's business was a "speculative contingenc[y]," where the underlying legal challenge involved the application of the Fourth Amendment exclusionary rule in civil liquor license revocation hearings).
 
 
 15
 Defendants contend that the Corporation may not avoid mootness by relying on a "self-serving" affidavit. Defendants rely on Deeper Life Christian Fellowship, Inc. v. Sobol, 948 F.2d 79 (2d Cir.1991) and Fox v. Board of Trustees of State University of New York, 42 F.3d 135 (2d Cir.1994), two cases in which plaintiffs sought to invoke the exception to mootness for harms that are "capable of repetition yet evading review," i.e., harms that are too short in duration to be fully litigated prior to cessation or expiration. See Deeper Life, 948 F.2d at 82-83; Fox, 42 F.3d at 142-44. In Deeper Life, a church brought suit challenging a school board's refusal to renew a permit allowing the church to make use of a school auditorium for weekly meetings. 948 F.2d at 80-81. After the church completed the renovations that had triggered its original need for access to the auditorium, the church submitted an affidavit explaining that it was in negotiations for the acquisition of property to be merged with Deeper Life's headquarters and would once again require the congregation to vacate the building. 948 F.2d at 82. We rejected the church's attempt to preserve its claim, because we found that the affidavit did not provide compelling evidence that the need asserted was in fact imminent. Id. at 82-83. In Fox, students who sued the State University of New York ("SUNY") graduated or left the school during the course of the litigation. 42 F.3d at 139. The students then submitted affidavits indicating "a very real possibility and a reasonable expectation" that they would return for graduate studies "within the next few years." Id. at 143. We rejected these assertions, finding that a "bare statement of intention is insufficient to escape mootness," and noting that the students' "expressed intention to return to the SUNY system is not solely within [their] power to accomplish [as] they would also have to be accepted by a school in the SUNY system." Id.
 
 
 16
 In this case, however, the Corporation does not seek to invoke the exception for harms that are "capable of repetition yet evading review." Furthermore, unlike Deeper Life and Fox — where the circumstances giving rise to the claim have come to an end and the party seeks to defeat mootness through an affidavit that asserts similar conditions will recur in the future-the relationships underlying the claim in this case have not ceased. As explained in the Garr affidavit, the Corporation's renewable lease on the premises for its adult entertainment business is still in effect and plaintiff does not intend to terminate it. The Corporation, therefore, does not assert that new, albeit similar, circumstances will occur in the future and for that reason the claim is not moot, but rather contends that the circumstances supporting the original claim continue to be in effect. In the absence of any proof offered by defendants contradicting the evidence of plaintiff's possession of a renewable lease, the Corporation's clear intention to continue operating the WRAP at the site of the lease is sufficient to demonstrate that the Corporation faces a reasonable expectation of future harm. Accordingly, the case is not moot.
 
 II. Freedom of Expression[2]
 
 17
 Although nudity is not an inherently expressive condition, "nude dancing of the type at issue here is expressive conduct . . . [that] falls only within the outer ambit of the First Amendment's protection." Pap's A.M., 529 U.S. at 289, 120 S.Ct. 1382. Thus, attempts to regulate such dancing are subject to constitutional scrutiny. The parties agree that because the Ordinance is a content-neutral regulation, i.e., one that is not enacted for the purpose of suppressing expression, it is subject to the four-factor test for expressive conduct set forth in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); see also Pap's A.M., 529 U.S. at 296, 120 S.Ct. 1382 (applying O'Brien when analyzing a content-neutral public indecency ordinance). Under O'Brien, an ordinance is valid if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial government interest; (3) the government interest is unrelated to the suppression of free expression; and (4) the restriction is not greater than is essential to the furtherance of the government interest. 391 U.S. at 377, 88 S.Ct. 1673. The district court and the parties agree that the first and fourth O'Brien factors have been satisfied in this case. The current dispute focuses on the second factor; plaintiff also argues that the Ordinance fails to satisfy the third factor.
 
 A. The Second O'Brien Factor
 
 18
 We determine whether the Ordinance furthers an important or substantial government interest by applying the standard the Supreme Court articulated in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986):
 
 
 19
 The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.
 
 
 20
 Id. at 51-52, 106 S.Ct. 925; see also id. at 51, 106 S.Ct. 925 (holding that the city was entitled to rely on the "detailed findings" of other cities as summarized in prior judicial opinions).
 
 
 21
 The Court has applied the Renton analysis in a series of divided opinions. First, in Barnes v. Glen Theatre, Inc., 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), a divided Court upheld the state of Indiana's public indecency statute. Applying the O'Brien test, the three-justice plurality found that although the legislature's intent in enacting the statute was "impossible to discern," the text of the statute and the long history of public indecency statutes expressing moral disapproval of public nudity was sufficient to demonstrate that the statute furthered a substantial government interest in protecting order and morality. Id. at 567-69, 111 S.Ct. 2456. Justice Souter concurred in the judgment, but rejected the plurality's reliance on moral disapproval to justify the ordinance. Id. at 582, 111 S.Ct. 2456. Instead, he applied the Renton standard and concluded that based on prior judicial decisions discussing secondary effects, Indiana could reasonably conclude that forbidding nude entertainment would further its substantial government interest. Id. at 583-85, 111 S.Ct. 2456.
 
 
 22
 In Pap's A.M., five justices adopted the Renton standard as the relevant test. The plurality found that the city had offered sufficient evidence to demonstrate that its public indecency ordinance furthered a substantial government interest, because the city "expressly relied on Barnes and its discussion of secondary effects," and also made its own findings with respect to the secondary effects of nude dancing establishments. 529 U.S. at 296-98, 120 S.Ct. 1382. Justice Souter dissented in part, agreeing with the plurality's analytical approach, but concluding that the city had failed to make a sufficient evidentiary record to sustain its regulation. Id. at 310-11, 120 S.Ct. 1382.
 
 
 23
 Finally, in City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 433, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), the Court "clarif[ied] the standard for determining whether an ordinance serves a substantial government interest under Renton." The plurality explained that although a "city certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects," a city need not conclusively prove its theory for establishing such a connection. Id. at 437, 122 S.Ct. 1728. Similarly, a city need not prove the efficacy of its proposed ordinance in dealing with secondary effects. Id. at 437, 439-40, 122 S.Ct. 1728. The plurality reiterated that Renton does not set "a high bar" for municipalities, but cautioned that a municipality cannot "get away with shoddy data or reasoning." Id. at 438, 122 S.Ct. 1728. The plurality concluded that Los Angeles had made a sufficient showing to survive summary judgment, because the city could reasonably rely on a 1977 study of adult business in Los Angeles to show that the ordinance was designed to promote the city's interest in reducing crime. Id. at 436, 439, 122 S.Ct. 1728. Because they found that the 1977 study was sufficient, the plurality refused to decide whether Los Angeles could also rely on post-enactment evidence to demonstrate that the ordinance furthered a substantial government interest. Id. at 442, 122 S.Ct. 1728. Justice Kennedy concurred, confirming that "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects." Id. at 449, 122 S.Ct. 1728. Justice Kennedy also relied only on the pre-enactment evidence in the record. Id. at 452, 122 S.Ct. 1728.
 
 
 24
 Thus, to demonstrate that an ordinance furthers a substantial government interest, a municipality must show that in enacting the legislation, it relied on some evidence "reasonably believed to be relevant" to the problem of negative secondary effects. Renton, 475 U.S. at 51, 106 S.Ct. 925. A city must provide some evidence of a connection between "the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." Alameda Books, 535 U.S. at 441, 122 S.Ct. 1728. However, a city need not prove that such a link exists or prove that its ordinance will be effective in suppressing secondary effects. Based on this standard, the Supreme Court has upheld ordinances where a city conducted hearings and reviewed a report on the experience of other cities, Renton, 475 U.S. at 44, 106 S.Ct. 925; expressly relied on the evidentiary foundation in prior judicial opinions as well as the city's own findings, Pap's A.M., 529 U.S. at 296-97, 120 S.Ct. 1382; and relied on a study conducted many years prior to enactment of the ordinance, Alameda Books, 535 U.S. at 430, 122 S.Ct. 1728.
 
 
 25
 Defendants argue that they may rely on "any evidence" of secondary effects, regardless of whether they reviewed such evidence before or after enacting the Ordinance. We disagree. Although the Supreme Court has not expressly decided the issue, the Renton standard suggests that pre-enactment evidence is necessary: a city need not conduct its own studies "before enacting" an ordinance, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses" in enacting the ordinance. See Renton, 475 U.S. at 51, 106 S.Ct. 925 (emphasis added). Applying Renton, the Court examined the sufficiency of pre-enactment evidence to support the ordinances at issue in Alameda Books, 535 U.S. at 429-30, 122 S.Ct. 1728 and Pap's A.M., 529 U.S. at 296-97, 120 S.Ct. 1382. See also Renton, 475 U.S. at 44, 106 S.Ct. 925. Although neither Justice Souter nor the plurality in Barnes required such evidence, the Barnes approach was superseded when five justices applied the Renton standard in Pap's A.M. and either relied on pre-enactment evidence or demanded an even greater evidentiary showing. We therefore join other circuits in reading Renton to require pre-enactment evidence. See Peek-A-Boo Lounge v. Manatee County, 337 F.3d 1251, 1268 & n. 16 (11th Cir.2003) (collecting cases); see also SOB, Inc. v. County of Benton, 317 F.3d 856, 862 (8th Cir.2003) (reviewing a county's pre-enactment evidence to determine "whether the County had sufficient evidence of adverse secondary effects to justify enacting the Ordinance."); D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 57-58 (1st Cir.1999) (reviewing whether town considered secondary effects evidence "prior to the ordinance's enactment"); Z.J. Gifts D-2, L.L.C. v. City of Aurora, 136 F.3d 683, 690 (10th Cir.1998) (City cannot "justify its actions with a completely barren legislative record."); SDJ, Inc. v. City of Houston, 837 F.2d 1268, 1274 (5th Cir.1988) ("We are persuaded that the City met its burden under [Renton] to establish that there was evidence before it from which the Council was entitled to reach its conclusion. . . ."). But cf. DiMa Corp. v. Town of Hallie, 185 F.3d 823, 829-30 (7th Cir.1999) (holding that a municipality need not provide pre-enactment evidence but "may make a record for summary judgment or at trial with evidence that it may not have had when it enacted its ordinance," but relying on Barnes for the "most relevant guidance" on this issue).
 
 
 26
 In this case, before enacting the Ordinance, the Selectboard reviewed up to three public indecency ordinances enacted by other Vermont municipalities and two letters from Town attorney Manby, which mentioned that a court had upheld a similar ordinance in SBC Enterprises. The Selectboard also held two meetings, at which the Town Manager provided an overview of the Ordinance and summarized its provisions. In addition, one or two members of the Selectboard discussed negative secondary effects with constituents. The Selectboard Chair, Steadman, has since explained that he put the Ordinance on the agenda because of his desire to protect economic development opportunities within the Town, and because he was concerned about the potential for the creation of negative secondary effects in areas where public nudity was occurring. This evidence is insufficient to meet defendants' burden under Renton.
 
 
 27
 First, most of defendants' evidence establishes only that members of the Selectboard believed there was a potential for negative secondary effects and were aware of the fact that other cities had analyzed the issue. In other words, although the Selectboard was aware that "relevant evidence" existed somewhere, the Selectboard did not actually review such evidence. For example, in one of his letters, Manby explains, "I know that among the points which were considered by the United States District Court in the SBC Enterprises case just cited was the fact that the South Burlington City Council had considered the `secondary effects' of the ordinance." However, Manby did not discuss the factual findings relied on by South Burlington, and, in fact, the SBC Enterprises opinion contains no detailed findings regarding secondary effects. See 892 F.Supp. 578, 580-81. While defendants could properly have relied on factual findings contained in a judicial opinion, they may not simply rely on the fact that other municipalities have enacted such ordinances and they have been upheld. See Renton, 475 U.S. at 50-51, 106 S.Ct. 925 (noting that a judicial opinion summarizing detailed factual findings "was before the Renton City Council when it enacted the ordinance in question"); see also Peek-A-Boo, 337 F.3d at 1267 n. 15 (passing reference to another city's ordinance and the fact of it being upheld on appeal is insufficient) (citing SDJ, Inc., 837 F.2d at 1274 (not enough "simply to tailor one ordinance to another that has survived judicial review")).
 
 
 28
 The Steadman affidavit also fails to demonstrate that the Selectboard relied on any evidence of potential secondary effects in enacting the Ordinance. The carefully-worded affidavit explains that Steadman was concerned about the "potential for the creation of negative secondary effects" and was "aware of the fact that other towns and cities had studied the issue of the creation of negative secondary effects from sites where public nudity is permitted." However, Steadman does not claim that he reviewed other studies or was in any way aware of the content of such studies. While a municipality may rely on the studies conducted by other towns, it may not simply rely on its knowledge that such studies exist. Cf. R.V.S., LLC v. City of Rockford, 361 F.3d 402, 411 (7th Cir.2004) ("Indeed, while courts may credit a municipality's experience, such consideration cannot amount to an acceptance of an `if they say so' standard. Rockford does not identify any studies, judicial opinions, or experience-based testimony that it considered in adopting the Ordinance."); DiMa, 185 F.3d at 829 (Town's "conclusory assertions regarding its goals and its effect are insufficient by themselves to survive a First Amendment challenge because they are not `evidence' as the Court required in Renton.").
 
 
 29
 The only indication that the Selectboard may have relied on evidence of the potential for negative secondary effects is the fact that one or two members of the Selectboard discussed such issues with some constituents. The evidence regarding these discussions is vague at best. Even if we were to find such evidence sufficient to meet the Renton standard, there is no indication that the Selectboard as a whole relied on this evidence. Thus, at most, this evidence establishes that two of the five Selectboard members — and not the Selectboard as a whole — may have relied on some evidence regarding secondary effects when enacting the Ordinance.
 
 
 30
 Because defendants cannot show that they relied on relevant evidence of negative secondary effects before enacting the Ordinance, they cannot establish that the Ordinance furthers a substantial government interest. Accordingly, the Ordinance is unconstitutional because it violates the Corporation's First Amendment right to free expression.
 
 B. The Third O'Brien Factor
 
 31
 Although the Corporation has not cross-appealed, it urges that we consider an additional basis for affirming the district court, namely, that the Ordinance fails to satisfy the third O'Brien factor. Because we find that the Ordinance fails under the second O'Brien factor, we need not reach this issue.
 
 CONCLUSION
 
 32
 For the foregoing reasons, we affirm the decision of the district court.
 
 
 
 Notes:
 
 
 [1]
 Although the district court found that the Ordinance violates both the First Amendment and Article 13 of the Vermont Constitution,White River, 412 F.Supp.2d at 428, 429, the court noted in its conclusion that "[p]laintiff's motion for summary judgment is DENIED with respect to . . . all Vermont Constitutional claims," id. at 430 (emphasis added). This statement appears to be an error; in this appeal the parties address both the federal and state constitutional claims.
 
 
 [2]
 The Corporation brings claims under both the First Amendment and Article 13 of the Vermont Constitution. The parties agree, however, that because the state provision provides substantially the same protections as the First Amendment, both freedom of expression claims may be analyzed under the same standardSee State v. Read, 165 Vt. 141, 153, 680 A.2d 944 (1996) (describing the provisions as "coextensive").